856 F.2d 802
 57 USLW 2168, 26 Fed. R. Evid. Serv. 875
 Lucien SHERROD, Individually and as Administrator of the
Estate of Ronald Sherrod, deceased, Plaintiff-Appellee,
v.
Willie BERRY, Frederick Breen and the City of Joliet, a
municipal corporation, Defendants-Appellants.
 No. 85-3151.
 United States Court of Appeals,
Seventh Circuit.
 Reheard En Banc Feb. 23, 1988.
Decided Aug. 22, 1988.
 
 William W. Kurnik, Kurnik & Cipolla, Arlington Heights, Ill., for defendants-appellants.
 Andrew J. Horwitz, Horwitz, Horwitz & Assoc., Ltd., Chicago, Ill., for plaintiff-appellee.
 Before BAUER, Chief Judge, and CUMMINGS, WOOD, CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.
 The original panel decision in this case affirming a jury's verdict against the defendants was vacated, Sherrod v. Berry, 835 F.2d 1222 (7th Cir.1988), and the case set for rehearing en banc. We reverse and remand for a new trial.
 COFFEY, Circuit Judge.
 
 I.
 
 1
 Because we are remanding the case for a new trial, we recite only those facts necessary to our decision. (A more complete recitation of the facts is detailed in Sherrod v. Berry, 827 F.2d 195, 198-200 (7th Cir.1987) and 827 F.2d at 211-13 (dissenting opinion)). On December 8, 1979, the operator of Ziggy's Plant and Gift Shop in Joliet, Illinois, reported to the police that a robbery had just taken place. Willie Berry, a Joliet police officer on patrol in the area, heard a police radio dispatch recounting the robbery and describing the suspect. Officer Berry told his partner, Officer Richard Klepfer, that the description of the robbery suspect fit Gary Duckworth. Berry testified at trial that he previously knew Duckworth to have been a suspect in other assaultive crimes, including "robberies and purse snatchings." After receiving another radio communique that the suspect had returned to the area of the robbery, Officer Berry and his partner decided to investigate and proceeded to the crime scene. En route, the officers observed two men sitting in a 1969 Cadillac in the bank parking lot adjacent to Ziggy's.
 
 
 2
 The 1969 Cadillac exited the parking lot and pulled onto the street where Officers Berry and Klepfer were patrolling. Officer Berry activated the squad's "mars lights" and directed the driver of the Cadillac to pull over. As the officer's car approached the Cadillac, Berry recognized Duckworth as the passenger in the Cadillac. At that point in time, Officer Berry believed he was apprehending the perpetrator of the Ziggy's robbery, who was probably armed and thus considered dangerous. As the suspect's car slowed to a stop, Officer Berry and his partner exited the patrol car and removed their guns from their holsters believing the automobile stop to be of high risk. Officer Berry and his partner assumed positions outside the police vehicle with their guns pointed at the occupants of the Cadillac, covering the suspects from separate angles. Following accepted police procedures, Berry ordered the suspects to raise their hands. The two suspects failed to comply with the command, and Berry had to order them to raise their hands three times before the suspects complied; this recalcitrance on their part to follow the raised arm order further aroused Berry's suspicion as to the imminent danger confronting him. Berry testified that "it seemed to me as though the passenger [Duckworth] was looking at the driver [Ronald Sherrod] as more or less 'what are we going to do next?' "
 
 
 3
 Officer Berry asked his partner, who had also drawn his gun, if he had the suspects under cover. Officer Klepfer responded in the affirmative. At this time, Officer Berry raised his gun and cautiously approached the Cadillac. Patrolman Berry testified that while looking into the vehicle and approaching the suspect, he observed the driver make a "quick movement with his hand into his coat ... [as if] he was going to reach for a weapon." At that point, Officer Berry fired his revolver at Sherrod, killing him instantly.
 
 
 4
 Lucien Sherrod, the father of the deceased, filed a 42 U.S.C. Sec. 1983 action individually and as administrator of his son's estate against Officer Berry, the City of Joliet, and the Joliet Chief of Police. The first count of the complaint alleged that: (a) Officer Berry violated 42 U.S.C. Sec. 1983 when he shot and killed Ronald Sherrod; (b) Chief of Police Breen and the City of Joliet violated 42 U.S.C. Sec. 1983 through their improper policy regarding the use of deadly force; and (c) the City failed to adequately train the Joliet police officers concerning correct procedures for making felony stops of vehicles as well as the use of deadly force. The second count alleged that the defendants, in depriving the plaintiff-appellee (Sherrod) of his right to raise a family, deprived him of his constitutional right of due process of law. During the trial, evidence was received over the objection of the defendants-appellants that a search of the deceased (Sherrod) failed to disclose that he was armed with a weapon. The trial judge admitted the evidence, reasoning that "had plaintiff been prevented from introducing this evidence, the record would have been such that the jury would have been left to speculate on whether Berry was justified in thinking that the claimed movement by Sherrod posed a danger to the police officer. This would not have been fair." Sherrod v. Berry, No. 80 C 4117, mem. op. at 38 (N.D.Ill. November 15, 1985) . The jury ultimately found for the plaintiff on both counts and awarded $1,601,700 in damages.
 
 II.
 
 5
 Defendants urge this court to reverse the jury's verdict, arguing that the trial court's receipt of evidence demonstrating that Ronald Sherrod was unarmed when Officer Berry discharged his weapon is not relevant to the question of whether Officer Berry reasonably believed that the use of deadly force was justifiable at the time of the shooting. The district court not only found that evidence as to whether Sherrod was unarmed was both relevant and material to determining whether Berry acted reasonably under the circumstances, but even implicitly stated on the record in its written findings dealing with a motion for a new trial that it would have been prejudicial to the plaintiff had the evidence not been received. Generally a "district court has broad discretion to determine the admissibility of evidence, and thus [this court] will reverse the court's evidentiary rulings only upon a clear showing of abuse of discretion." United States v. Garver, 809 F.2d 1291, 1297 (7th Cir.1987); see also Davis v. Lane, 814 F.2d 397, 399 (7th Cir.1987). But "[d]iscretion does not mean immunity from accountability." 1 Weinstein's Evidence, p 401. Where a district court applies an improper legal standard as the basis for allowing to be received in evidence facts not only irrelevant but also prejudicial to the determination of a party's liability (in this case Officer Berry's liability), the court's decision obviously constitutes an abuse of discretion.
 
 
 6
 Under Fed.R.Evid. 401,[1] "relevancy is a relationship between a proferred item of evidence and a 'fact that is of consequence to the determination of the action.' " 1 Weinstein's Evidence, p 401, pp. 401-17. "Whether or not a fact is of consequence is determined not by the Rules of Evidence but by substantive law." Id. at 401-19. Thus, before the district court could properly have received evidence that Sherrod was unarmed at the time of the shooting, the district court had to find that this fact was relevant to the determination of Officer Berry's liability in the first instance.
 
 
 7
 In Lester v. City of Chicago, 830 F.2d 706 (7th Cir.1987) this court applied an "objective reasonableness under the circumstances" standard to Fourth Amendment excessive force and arrest claims. Lester stated that "the Fourth Amendment test measures [the] ... objective reasonableness [of an officer's actions] under the circumstances." 830 F.2d at 711. In phrasing the test set forth in Lester as one of "objective reasonableness under the circumstances," it is obvious that "under the circumstances" refers only to those circumstances known and information available to the officer at the time of his action (firing the fatal shot). When a jury measures the objective reasonableness of an officer's action, it must stand in his shoes and judge the reasonableness of his actions based upon the information he possessed and the judgment he exercised in responding to that situation.
 
 
 8
 Knowledge of facts and circumstances gained after the fact (that the suspect was unarmed) has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment. Were the rule otherwise, as the trial court ruled in this instance, the jury would possess more information than the officer possessed when he made the crucial decision. Thus, we are convinced that the objective reasonableness standard articulated in Lester requires that Officer Berry's liability be determined exclusively upon an examination and weighing of the information Officer Berry possessed immediately prior to and at the very moment he fired the fatal shot. The reception of evidence or any information beyond that which Officer Berry had and reasonably believed at the time he fired his revolver is improper, irrelevant and prejudicial to the determination of whether Officer Berry acted reasonably "under the circumstances."
 
 
 9
 The record of the first trial substantiates Officer Berry's testimony that he fired at Sherrod because he reasonably believed in the split second he had to react to Sherrod's furtive, rapid movement, that he and his partner were in imminent danger of death or great bodily harm. As Officer Klepfer testified, Sherrod made a "quick movement with his hand into his coat" and "there was no doubt in my mind when he started to move, he was going to reach for a weapon of some type." Officer Berry never claimed that he actually saw a weapon, but stated that he simply reacted to what a reasonable person would consider to be a life-threatening and imminently dangerous situation. Thus, absent a constitutional violation, appellate judges would be well advised not to second-guess an officer's split-second reasonable judgment to protect himself and those around him through the use of deadly force; rather, courts and juries must determine the propriety of the officer's actions based upon a thorough review of the knowledge, facts and circumstances known to the officer at the time he exercised his split-second judgment as to whether the use of deadly force was warranted.
 
 
 10
 Our holding is consistent with both today's opinion in Ford v. Childers, 855 F.2d 1271 (7th Cir.1988), and the Supreme Court's decision in Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). In both cases, the respective courts reviewed the totality of the circumstances known to the police officer at the time of the incident in determining whether the officer acted reasonably. (Ford also involved an officer's use of deadly force in the apprehension of a suspect.) In Garner, the Court stressed the rule that it is reasonable to use deadly force if the officer, when exercising his or her reason and judgment, has probable cause to believe that the suspect poses a threat of death or serious physical harm to the officer or others and, whenever possible, warns the suspect before firing. Id. at 11-12, 105 S.Ct. at 1701. The Court specifically stated:
 
 
 11
 "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape and if, where feasible, some warning has been given."
 
 
 12
 Id. Similarly, as here, when an officer believes that a suspect's actions places him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force. As aptly noted in Young v. City of Killeen, Tx., 775 F.2d 1349, 1353 (5th Cir.1985), "no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." Id. at 1353 (emphasis added).
 
 
 13
 Our holding today is likewise consistent with Davis v. Freels, 583 F.2d 337 (7th Cir.1978). There Wallace Davis sued Joseph Freels, a Chicago police officer, under 42 U.S.C. Sec. 1983 after Freels shot him in the back. The facts in Davis establish that Officer Freels and his partner believed Davis and another individual were wanted in connection with a shooting incident. Police officers co fronted Davis and his companion and ordered the two men to walk over and place their hands on the car. Officer Freels testified that as Davis turned to put his hands on the car, he (Officer Freels) "saw a sudden movement with his [Davis's] right elbow in a backward direction." Responding to this sudden and suspicious movement, Officer Freels fired his revolver, previously drawn as a precautionary measure, at the suspect. This court upheld the jury's verdict that Davis was not deprived of any rights under 42 U.S.C. Sec. 1983 and quoted with approval from 6th Am.Jur.2d Assault & Battery, Sec. 161 at 135 (1963):
 
 
 14
 "In a civil action for assault, the defendant's belief that the plaintiff intended to do him bodily harm cannot support a plea of self defense unless it was such a belief as a reasonable person of average prudence would have entertained under similar circumstances. It is not necessary that the danger which gave rise to the belief actually existed; it is sufficient that the person resorting to self defense at the time involved reasonably believed in the existence of such a danger, and such reasonable belief is sufficient even where it is mistaken. In forming such reasonable belief a person may act upon appearances. In other words, it is sufficient that the danger was reasonably apparent."
 
 
 15
 583 F.2d at 341 (emphasis added). In this case the investigation conducted after the shooting revealed that Sherrod was unarmed. But at the time Officer Berry made the crucial decision to discharge his revolver, he was unaware of this fact. Officer Berry testified that he believed that he was apprehending an armed and dangerous suspect who had just committed a robbery and further that this suspect made a "quick movement with his hand into his coat ... [as if] he was going to reach for a weapon." The veracity of Officer Berry's testimony and the reasonableness of his actions based upon the totality of the information he possessed at the time of the shooting are questions we leave for a properly informed and instructed jury on remand. In short, we categorically reject the district court's assertion that fairness requires that the jury be presented with facts unknown and unavailable to Officer Berry at the time of the shooting (that Sherrod was unarmed). To the contrary, we hold that justice requires that the jury analyze and weigh the reasonableness of Officer Berry's conduct just as he was compelled to do in a split second on that fateful day, without the knowledge that Sherrod was unarmed. The Sioux Indians have a prayer that asks for this wisdom: "Grant that I may not judge another until I have walked a mile in his moccasins."
 
 
 16
 Our holding today should not be interpreted as establishing a black-letter rule precluding the admission of evidence which would establish whether the individual alleging a Sec. 1983 violation was unarmed at the time of the incident. Clearly, the credibility of the witness "can always be attacked by showing that his capacity to observe, remember or narrate is impaired." 3 Weinstein's Evidence p 607 p. 607-55. Further, "impeachment by contradiction is a technique well recognized in the federal courts by which specific errors in the witness's testimony are brought to the attention of the trier of fact." Id. at p 607 p. 607-76. For example, if an officer testifies that "I saw a shiny, metallic object similar to a gun or a dangerous weapon in the suspect's hand," then proof that the suspect had neither gun nor knife would be material and admissible to the officer's credibility on the question of whether the officer saw any such thing (and therefore had a reasonable belief of imminent harm). See, e.g., Davis v. Lane, 814 F.2d 397, 399 (7th Cir.1987) (wherein we held that the existence of a homemade knife or shank was clearly relevant to the question of the reasonableness of Officer Hull's reaction where Officer Hull thought that he saw the inmate reach for something shiny, perhaps a homemade knife or shank). But, as in this case, if the officer says "I saw the suspect reach quickly for his pocket," then proof of the contents of the pocket does not contradict the officer's testimony. Here, Officer Berry did not testify that he saw an object in Sherrod's coat or in his hand; rather, Officer Berry testified only that he saw Sherrod make a "quick movement with his hand into his coat." Thus, evidence that Sherrod was unarmed is irrelevant for impeachment purposes, and the jury must determine the reasonableness of Berry's actions limited to the facts known to Berry when he acted, no more and no less. Having ruled that evidence establishing that Sherrod was unarmed is immaterial to the question of the reasonableness of the officers' actions under the totality of the circumstances, we are impelled to conclude that the trial court's error in admitting the evidence was also unfairly prejudicial to the defendants.
 
 
 17
 Evidence that Sherrod was unarmed (information not available to Officer Childers) is not only irrelevant, as explained above, but also tends to induce the trier of fact to premise its ultimate determination of liability on an improper basis: namely, to infer from the fact that Sherrod was unarmed that Officer Childers' use of his weapon was unreasonable. Such an inference is manifestly inappropriate, and a new trial is the only way to remedy the evidentiary error.
 
 
 18
 Judges must never forget that "[p]eace officers stand at the front of law and the ordering processes of society," Grandstaff v. City of Borger, 767 F.2d 161, 166 (5th Cir.1985), cert. denied, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987).[2] Nevertheless, we hasten to point out that we must and will continue to be vigilant in ensuring that officers, in exercising the critical judgment of when and where to use deadly force, will always be subject to review based upon the very information known to the officer at the time of his or her actions under the Davis v. Freels standard:
 
 
 19
 "It is not necessary that the danger which gave rise to the belief actually existed; it is sufficient that the person resorting to self defense at the time involved reasonably believed in the existence of such a danger, and such reasonable belief is sufficient even where it is mistaken. In forming such reasonable belief a person may act upon appearances. In other words, it is su ficient that the danger was reasonably apparent."
 
 
 20
 583 F.2d at 341 (emphasis added). On remand it will be for the jury to determine whether Officer Berry ultimately acted reasonably based upon the knowledge and information he possessed at the time he fired the fatal shot. It is precisely this unknown danger that our law enforcement officers face daily, and we refuse in this instance to second-guess objectively reasonable police decisions.
 
 III.
 
 21
 Because we reverse and remand for a new trial, we need not discuss the district court's other evidentiary rulings or jury instructions. We leave these questions for the district court on remand to decide in light of this court's prior discussions of those matters, specifically those found in our earlier vacated opinion.
 
 
 22
 For the afore-mentioned reasons, we reverse and remand this case for further proceedings in the district court consistent with this decision.
 
 
 23
 RIPPLE, Circuit Judge, concurring.
 
 
 24
 I concur in the judgment. In my view, the district court's failure to give defendant's instruction No. 10 and the giving of plaintiff's instruction No. 28.1[1] constitute reversible error and requires a new trial. With respect to the admissibility of evidence as to whether Mr. Sherrod had a weapon, I agree essentially with the view stated by Judge Cummings in these en banc proceedings.
 
 
 25
 CUMMINGS, Circuit Judge, with whom CUDAHY, Circuit Judge, joins, dissenting.
 
 
 26
 The majority's opinion misrepresents the parties and events involved in the killing of Ronald Sherrod, misinterprets the applicable legal standards and rules and allows an argument waived by the defendants to prevail. The result is a miscarriage of justice. Ford v. Childers, 855 F.2d 1271 (7th Cir.1988) (en banc) (Cudahy, J., concurring).
 
 
 27
 The majority's version of the facts presents a good police officer in a bad situation confronting a recalcitrant suspect. The record presents a bad cop with a history of unnecessary violence, acting in violation of police procedure, confronting an innocent victim. This characterization is important because the issue on rehearing is whether the district court clearly abused its discretion when it admitted evidence it determined was relevant to the credibility of Berry's version of the events leading to his shooting and killing Ronald Sherrod. Therefore, before addressing the legal issues we find it necessary to correct several crucial misstatements of the facts.
 
 
 28
 * The majority opinion states that "[f]ollowing accepted police procedures, Berry ordered the suspects to raise their hands," then it characterizes their reaction as "recalcitrance" which "further aroused Berry's suspicion." Maj. op., supra at 803. Berry testified to, and the majority makes much of, the fact that he had to order Sherrod and Duckworth to raise their hands three times before they complied. Although Sherrod and Duckworth may not have responded until Berry completed all three of his vulgar and abusive commands to "get their motherfucking hands up" (Tr. at 406),[1] this "failure" cannot accurately or fairly be labeled recalcitrance. It is not clear from the record how much time elapsed between each of these commands. But if any time at all elapsed, it must have been very little because Officer Klepfer testified that from the time Sherrod responded and stopped his car until the time Berry shot and killed him only "10, 12 seconds maybe" elapsed. (Tr. at 1241).
 
 
 29
 The majority also mischaracterizes the nature of the stop and the danger that Berry's partner Officer Klepfer perceived. The majority presents Duckworth as probably armed and dangerous. Nothing in the record supports this view. The police dispatcher described the incident at Ziggy's over the radio as follows, "[a]pparently was a sneak thief. He took the money, was chased by an employee. The employee got the money back." (Tr. at 1117). Nothing in this or any of the other radio dispatches concerning the alleged sneak thievery at Ziggy's indicated that the suspect was armed or dangerous. Although Berry stated that he never heard the broadcast calling the suspect a "sneak thief," he admitted that he had no reason to believe that Duckworth had ever committed any violent acts. (Tr. at 417-418). As to reasonable suspicions concerning Sherrod, the radio dispatches reported the suspect as one man, on foot, so that Berry had no information indicating that Sherrod was in any way involved in the sneak thievery or was otherwise armed or dangerous.
 
 
 30
 In addition, neither the manner in which the stop was made nor Sherrod and Duckworth's response indicated any danger. Sherrod responded immediately to Berry's hand signal to pull over (Tr. at 445), and sat "peacefully" in the car (Tr. at 502 and 1156), doing nothing that indicated to Berry that he was going to create any problems. (Tr. at 1203). The majority states that "Officer Berry and his partner ... believ[ed] the automobile stop to be of high risk." However, the record indicates that Officer Klepfer did not feel he was in any danger at the time the stop was made (Tr. at 1280), or when Sherrod moved his hand toward his pocket. (Tr. at 1280-1281). Rather, Officer Klepfer's sense of security was so great, due to Sherrod's "compliance," that when Berry asked Klepfer "Do you have him?" Klepfer responded "Yes," but at the same time relaxed his finger from the trigger. (Tr. at 1285).
 
 
 31
 Finally, the majority's version creates the impression that the stop was a proper cautious one in which the officers assumed protective positions. This was not the case. In a proper felony stop, Berry would have stopped his car behind Sherrod's and, from a position of relative safety behind the open doors of the squad car, ordered Sherrod and Duckworth out of their vehicle. Berry admitted that the circumstances would have allowed him to make a proper felony stop (Tr. at 525), but that instead he incautiously chose to confront Sherrod's car head-on. By violating proper police procedure, Berry unnecessarily placed himself in the position he later perceived as dangerous to himself and his partner (Tr. 502-503), and which led to the death of Ronald Sherrod.
 
 II
 
 32
 The majority is able to hold that the district court clearly abused its discretion because the majority finds that the district court applied an improper legal standard. Maj. op., supra at 804. Unfortunately, it is the majority, not the district court, that applies an improper legal standard. The majority correctly identifies the applicable legal standard in a Fourth Amendment excessive force claim as a test of " 'objective reasonableness under the circumstances.' " Id. at 804 (quoting Lester v. City of Chicago, 830 F.2d 706, 711 (7th Cir.1987)), but the majority then fails to apply this objective test to the circumstances that resulted in Sherrod's death. Instead, by narrowly defining what constitutes the circumstances and what constitutes impeachment, the majority uses a subjective test that gives to the law enforcement officer the wide discretion it denies the district court.
 
 
 33
 In the majority's narrow view "it is obvious that 'under the circumstances' refers only to those circumstances known and information available to the officer at the time of his action (firing the fatal shot)." Maj. op., supra at 804. Therefore, the "[k]nowledge of facts and circumstances gained after the fact (that the suspect was unarmed) has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment." Id.[2]
 
 
 34
 The limitations the majority imposes on what constitutes the circumstances are neither intuitively obvious nor, more importantly, obvious from this Court's opinion in Lester. In Lester we cited Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1, for the proposition that the balancing of interests between the individual and the government depends on "whether the totality of circumstances justifies a particular sort of ... seizure." Lester, 830 F.2d at 711 (emphasis added). Then, as an example of what factors courts should consider in determining the totality of the circumstances, we cited Gilmere v. City of Atlanta, 774 F.2d 1495 (11th Cir.1985) (en banc ), certiorari denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). In Gilmere, the police received a report that Thomas Patillo had pulled a gun from the trunk of his car and threatened the driver of another vehicle. When the police arrived at Patillo's home and ordered him to the police car for questioning, he put up some resistance and attempted to flee. A scuffle ensued and an officer shot Patillo in the stomach and killed him. Id. at 1496-97. In evaluating Patillo's estate's Fourth Amendment claim against the police and evaluating the reasonableness of the officer's action under the totality of the circumstances, the Eleventh Circuit en banc considered that "the police had little cause to believe Patillo himself to be dangerous. Given his small size, intoxicated state, and lack of a weapon, he clearly posed little threat to their safety when they initially began escorting him to the patrol car." Id. at 1502 (emphasis added). Obviously, the after-the-fact information that the suspect/victim was unarmed had a place in the Eleventh Circuit's post-hoc analysis of the totality of the circumstances. Consistent with Lester and Gilmere, the after-the-fact information that Sherrod was unarmed had a place in the jury's post-hoc analysis of the totality of the circumstances leading to Berry's shooting Sherrod at point-blank range.
 
 
 35
 In addition to its relevance as part of the totality of the circumstances leading to the killing of Ronald Sherrod, the evidence that Sherrod was unarmed is relevant as part of the testimony helping the jury understand the type of movement Sherrod made that precipitated his death. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. The manner in which Sherrod reached into his pocket is of great consequence to the determination of the action--it was this movement that caused Berry to shoot and kill him.
 
 
 36
 The jury was presented with conflicting versions of how Sherrod reached into his jacket. The descriptions of the action, both verbal and demonstrative, were repetitive and confusing. Adding to the confusion was the element that different versions came not only from different witnesses but also from the same witness on direct examination, cross-examination and through impeaching prior testimony read to the jury as admissions. See Tr. at 1133, 1181-1186, 1240, 1266, 1280-1281, 1282-1283. Whether Berry's response was reasonable depends in large measure on the nature of Sherrod's movement, and the fact that Sherrod did not have a gun has the tendency to make some of the conflicting versions more probable. The fact that there was no gun was relevant to help the jury evaluate the conflicting testimony and determine the type of movement Sherrod made.
 
 
 37
 In addition to holding that the fact that Sherrod was unarmed is irrelevant to the determination of the reasonableness of Berry's action, the majority holds that "evidence that Sherrod was unarmed is irrelevant for impeachment purposes." Maj. op., supra at 806. Once again the majority has taken too narrow a view of the applicable law. To be relevant for impeachment purposes evidence need not directly counter "black" with "white" or "yes" with "no;" it need only detract from the credibility of a witness or the veracity of his testimony.
 
 
 38
 The majority admits that "if an officer testifies that 'I saw a shiny, metallic object similar to a gun or a dangerous weapon in the suspect's hand,' then proof that the suspect had neither a gun nor a knife would be material and admissible to the officer's credibility on the question of whether the officer saw any such thing." Maj. op., supra at 806. The majority sees this as an example of "no" countering "yes;" however, that is not why this evidence would be impeaching. The officer in the majority's example testified that he saw a gun. The after-the-fact determination that no gun existed does not mean that the officer did not sincerely believe that he saw one, but it does make it less likely that the officer believed he saw one or, if he did believe he saw one, tends to make that belief unreasonable. It is also relevant to the observational abilities of the officer and reflects upon the veracity of his testimony. Simply stated, in the majority's example the impeachment goes not to the existence of a weapon, but to the probability that the officer's version of the events is credible.
 
 
 39
 For this reason, the majority's attempt to differentiate the above scenario from Berry's situation fails. The majority states that "Officer Berry did not testify that he saw an object in Sherrod's coat or in his hand; rather, Officer Berry testified only that he saw Sherrod make a 'quick movement with his hand into his coat;' " from this the majority concludes "[t]hus, evidence that Sherrod was unarmed is irrelevant for impeachment purposes." Id. at 807. But the fact that Sherrod was unarmed does not necessarily mean that Berry acted unreasonably.[3] Instead, as in the majority's example, the fact that no gun existed does make it less likely that Berry thought he was in danger and makes the evidence impeaching in the same manner as in the majority's example. The object of the relevancy determination is the reasonableness of Berry's conclusion that he was in danger and the credibility of his testimony at trial. Thus the fact that Sherrod was unarmed is relevant for the same reasons that the evidence is relevant in the majority's example.
 
 
 40
 In conclusion, I find the evidence that Sherrod was unarmed relevant to the totality of the circumstances and to determining the credibility of Berry's testimony. The majority finds the evidence irrelevant. However, the outcome of this appeal should not depend on which version garners a majority of votes. At this stage of the proceedings we are not making a de novo determination of whether to admit the evidence; we are reviewing the determination of the district court and can reverse only if the district court clearly abused its discretion. United States v. Laughlin, 772 F.2d 1382, 1392 (7th Cir.1985) ("a trial court possesses broad discretion in determining the relevance of proffered evidence, and its decision will not be disturbed on appeal absent a clear showing that the court abused its discretion"). Regardless of which view would prevail in an evidentiary ruling made today, the district court's decision to admit this evidence cannot be reversed because there has been no clear showing that the court abused its discretion.
 
 III
 
 41
 Finally, although the majority never argues in the alternative that if the evidence that Sherrod was unarmed is relevant it should still be excluded because it is more prejudicial than probative, the majority nevertheless attempts to buttress its holding that the evidence should be excluded by stressing its prejudicial impact. See maj. op., supra at 805 and 807. But the issue of whether its prejudicial impact outweighs its probative value has been waived by the defendants.
 
 
 42
 To preserve an issue for appellate review, a party must make a proper objection that alerts the trial court and the opposing party to the specific grounds for the objection. United States v. Wynn, 845 F.2d 1439, 1442 (7th Cir.1988); see also Laughlin, 772 F.2d at 1391-92. "An objection is proper only if 'a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context....' " Wynn, 845 F.2d at 1442 (quoting Fed.R.Evid. 103(a)(1)). The specific ground for reversal of an evidentiary ruling on appeal must be the same specific ground as that stated in the proper objection at trial. Id.; see also United States v. Taylor, 800 F.2d 1012, 1017 (10th Cir.1986), certiorari denied --- U.S. ----, 108 S.Ct. 123, 98 L.Ed.2d 81; United States v. Medina, 755 F.2d 1269, 1275-76 (7th Cir.1985); United States v. Hickerson, 732 F.2d 611, 613 (7th Cir.), certiorari denied, 469 U.S. 846, 105 S.Ct. 159, 83 L.Ed.2d 95 (1984).
 
 
 43
 On appeal, defendants argue for the first time that even if the evidence that Sherrod was unarmed is relevant under Rule 401, it should have been excluded because under Rule 403 "its probative value is substantially outweighed by the danger of unfair prejudice and confusion of the issue." (Br. at 37). Defendants failed to preserve this argument.
 
 
 44
 When evidence that Sherrod was unarmed was offered at trial, the defendants did not object on any ground whatsoever. (Tr. 144-147, 277, 438 and 1285). Despite their failure to object at trial, defendants argue that the issue is preserved for appeal by their motion in limine. Then, because their motion in limine cited no authority but simply requested, without reason, that the court prohibit the introduction of evidence concerning the nonexistence of a weapon (R. at 176), defendants rely on the arguments made to the trial court on the first day of trial.[4] (Reply Br. at 1-3). During the argument, the trial court emphasized that it believed the evidence was relevant, even critical. The defendants correctly interpreted this ruling as definitive, leaving no room for reconsideration, and thus relieving them of the responsibility of objecting at trial on relevancy in order to preserve the issue for appeal. See American Home Assurance Co. v. Sunshine Supermarket, Inc., 753 F.2d 321, 324-25 (3d Cir.1985).
 
 
 45
 Relevancy, however, is a separate issue from prejudice and each is governed by a separate rule of evidence. See Fed.R.Evid. 401 and 403. Consequently, the issue of whether the prejudicial effect of the admission of evidence outweighs its probative value is not preserved by an objection to the evidence on the separate ground of relevancy. See, e.g., Laughlin, 772 F.2d at 1392-93. Although the district court's ruling on relevancy appeared firm, making further discussion at the time or future objections at trial on that issue futile and thus unnecessary to preserve the issue for appeal, the court did not rule on the issue of prejudice. The court's firmness on one issue does not excuse counsel from interjecting an objection on the ground that the court's ruling on relevancy would unfairly prejudice his client. See, United States v. Warner, 855 F.2d 372, 374, (7th Cir. Aug. 10, 1988) (counsel has a duty to object, even at the risk of incurring the wrath of the trial court that has stated it does not want to discuss the issue further). But the defendants did not mention prejudice in their written motion in limine, at argument on that motion, or in an objection at trial. This failure to present the argument to the district court waives it on appeal.IV
 
 
 46
 The majority states that its holding is consistent with today's opinion in Ford. Maj. op., supra at 805. It is not. In Ford we "emphasize[d] that this court must and will continue to be vigilant in ensuring that when an officer makes the critical judgment to use deadly force, his or her actions will be subject to scrutiny and review.... [We noted that] an officer oftentimes has only a split second to make the critical judgment of whether to use his weapon. But this fact alone will never immunize an otherwise unreasonable use of deadly force." Ford, 855 F.2d at 1276. Yet in Sherrod, the majority allows this vigilance to lapse in favor of the wisdom of a Sioux Indian prayer. Maj. op., supra at 806.. We can only hope that in the Sherrod family's third attempt to resolve this tragedy, the jury restores the vigilant review the majority has eviscerated.
 
 
 47
 As shown in the panel opinion, 827 F.2d 195, and herein, affirmance was warranted.
 
 
 48
 FLAUM, Circuit Judge, dissenting.
 
 
 49
 Federal Rule of Evidence 402 provides that all relevant evidence is initially to be viewed as admissible.[1] In my judgment, the evidence presented at trial on the issue of whether the deceased was armed was relevant, but its prejudicial effect should have precluded its admission. Had the evidence been properly objected to, its admission would have warranted reversal of this case. However, because no objection was ever interposed on the specific ground of prejudice, the jury's verdict should stand. I write separately because my view regarding the admission of this evidence is not advanced by or reflected in the other opinions of the court.
 
 I.
 
 50
 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. This definition of relevant evidence is an expansive one. To be relevant, evidence need not conclusively decide the ultimate issue in a case; it must simply tend to make a witness' testimony more or less credible. 1 J. Weinstein & M. Berger, Weinstein's Evidence p 401. See Davis v. Lane, 814 F.2d 397, 399 (7th Cir.1987) (in a Sec. 1983 claim, evidence that Davis may have been armed with a shank was relevant to the reasonableness of officer's decision to shoot him); United States v. Miroff, 606 F.2d 777, 781 (7th Cir.1979), cert. denied, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980) (evidence of guns found in defendant's bedroom was admissible as relevant; even though the guns did not demonstrate that defendant was guilty of transporting stolen goods, it was at least a "circumstance" the jury could consider); Saladino v. Winkler, 609 F.2d 1211, 1214 (7th Cir.1979) (in Sec. 1983 excessive use of force case, fact that plaintiff was intoxicated at time of arrest was relevant to the issue of the reasonableness of plaintiff's conduct).
 
 
 51
 As complicated as it is to construct a factual picture at the trial court level, it is even more difficult to recreate it on appeal. It is for this reason that great deference must be given to a district judge's evidentiary rulings. Accordingly, on appeal a district court's decision on the relevance of proffered evidence should not be disturbed absent an abuse of discretion. In this case, I would initially accept the district judge's finding that the evidence that Sherrod was unarmed (or if it had been otherwise, the evidence that he was armed) was relevant. Applying our highly deferential standard of review in this area, I cannot conclude that a clear showing has been made that the trial court abused its discretion in determining the relevance of this evidence.
 
 
 52
 The contents of Ronald Sherrod's clothing, and the fact that he did not have a gun in his possession, were relevant because this information could have arguably aided the jury in evaluating the probative value of various witnesses' conflicting testimony regarding the manner in which Sherrod reached toward his shirt pocket--the action that allegedly precipitated Officer Berry's decision to shoot him. See 1 J. Weinstein & M. Berger, Weinstein's Evidence p 401 (evidence is relevant if it "will aid the court or jury in evaluating the probative value of other evidence offered to affect the probability of the existence of a consequential fact."). Furthermore, the fact that Sherrod was unarmed may have tended to make less credible Officer Berry's testimony about Sherrod's actions, and might have informed the jury's consideration of whether a reasonable officer would have believed that he or she was in imminent danger. See supra at 811-810 (Cummings, J., dissenting). While the appropriate test to be applied in this case is the "objective reasonableness" of Officer Berry's actions, I believe this evidence satisfied the very broad standards of Federal Rule of Evidence 401.[2]
 
 II.
 
 53
 Having concluded that the evidence in question can be appropriately viewed as relevant, the critical question in my judgment is whether it should have been excluded under Federal Rule of Evidence 403. Under the balancing test of Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." Fed.R.Evid. 403. Evidence is unfairly prejudicial if it creates "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Id. (advisory committee notes). As we have frequently recognized, all relevant evidence is inherently prejudicial. See, e.g., United States v. Thomas, 676 F.2d 239, 244 (7th Cir.1980), cert. denied, 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 364 (1981). Relevant evidence should be excluded only if it contains a risk of unfair prejudice that substantially outweighs its probative value. As with the determination that evidence is relevant under Rule 401, a district judge has broad discretion to determine whether the probative value of certain evidence is outweighed by its possible prejudice.
 
 
 54
 In the present case, as a thorough review of the record clearly establishes, the defendants did not specifically object to the admission of the evidence that Sherrod was unarmed on the basis of Rule 403.[3] The district court therefore never explicitly determined whether this evidence was so inherently prejudicial that its probative value was outweighed by the potential prejudice. See supra at 812-13 (Cummings, J., dissenting). Admittedly, the district court's seemingly unwavering position on the admissibility of this evidence made an objection on Rule 403 grounds uninviting. However, it was incumbent upon counsel to at least proffer a Rule 403 objection. See Sadowski v. Bombardier Ltd., 539 F.2d 615, 623 n. 7 (7th Cir.1976) (quoting Phillips v. Kitt, 290 F.2d 377, 378 (D.C.Cir.1961) (Counsel has a duty " 'even at the risk of incurring the displeasure of the trial court, to insist upon his [or her] objection. Having failed to do so, it is too late to urge this as error here.' "). Counsel's lack of diligence resulted in a waiver of this crucial argument, a controlling fact that we should not ignore.
 
 
 55
 Informing the jury that Sherrod did not have a weapon most probably tainted its decision with an impermissible emotional consideration. Thus, had this objection been preserved for appeal, I would have been persuaded to find the admission of this evidence to be a clear abuse of discretion. I would therefore have reversed the verdict on the ground that this evidence was substantially more prejudicial than probative.[4]
 
 III.
 
 56
 The lamentable events of this case starkly reflect the ofttimes tragic nature of citizen/police contact. In my view, however, this appeal is not the appropriate avenue by which to review the propriety of the police procedures of the city of Joliet, severely lacking as they might be in this particular case. Our purpose should be simply to ensure the essential fairness of the trial.
 
 
 57
 We can never be certain what the district judge's ruling would have been if the defendants had objected to the admission of the evidence that Sherrod was unarmed under Rule 403. Thus, we cannot reverse on that basis. Although I strongly believe that this evidence was unduly prejudicial, the defendants' failure to clearly preserve this specific issue should mandate that we leave the jury's verdict untouched. I am therefore compelled to respectfully dissent.
 
 
 
 [1]
 The Federal Rules of Evidence provide only for the admission of
 "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence."
 Fed.R.Evid. 401, 402.
 
 
 [2]
 Federal Bureau of Investigations statistics establish that of the 63 officers killed in 1986, almost 50 percent (29/63) were killed in situations similar to the one Officer Willie Berry faced in the present case. Law enforcement officers killed by gunshot during the 11-year period from 1976 to 1986 were most often within 10 feet of their assailants at the time of the fatal encounter. FBI statistics further establish that patrol officers on investigative stops have consistently comprised the largest percentage of law enforcement victims throughout the past decade. Even the United States Supreme Court has "[s]pecifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile." Pennsylvania v. Mimms, 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977). Statistics such as these underscore our reluctance to second-guess an officer's split-second judgment to use deadly force, except in the absence of a clear-cut constitutional violation, when he reasonably believes his or her life is in immediate danger. We as judges have minutes, hours, days, weeks, even months to analyze, scrutinize and ponder whether an officer's actions were "reasonable," whereas an officer in the line of duty all too frequently has only that split second to make the crucial decision. True fairness requires that when a plaintiff asserts a Sec. 1983 claim against law enforcement officers for their alleged excessive use of deadly force, the reasonableness of their actions and conduct be determined based only upon that information the law enforcement officer possessed at the time he acted
 
 
 [1]
 The trial court's treatment of this issue is discussed by the panel in Sherrod v. Berry, 827 F.2d 195, 202-03 (7th Cir.1987) and 827 F.2d at 218-19 (Coffey, J., dissenting)
 
 
 [1]
 The majority states that Berry followed accepted police procedures when he ordered Sherrod and Duckworth to raise their hands. While it may be proper police procedure to order suspects to raise their hands, nothing in the record reflects that police procedures require, encourage or permit an officer to scream at suspects "Get your hands up, you motherfuckers." (Tr. at 407). The record does indicate that the City of Joliet provided Berry with no training or information regarding the effect the use of profanity has on a citizen during an investigative or felony stop. (Tr. at 529)
 
 
 [2]
 The majority acknowledges that if the absence of a gun is irrelevant to the determination of whether the officer acted reasonably, the presence of a gun is equally irrelevant. However, the majority does not acknowledge the unprecedented nature of this holding. No court has held the absence of a weapon irrelevant and, as to the presence of a weapon, in Davis v. Lane, 814 F.2d 397, 399 (7th Cir.1987), this Court held the opposite--that the presence of a shank was clearly relevant to the question of the reasonableness of a prison guard's action when he fired his gun at an inmate. The effect of the majority's holding will be to cause havoc the first time an officer, trying to establish that he acted in self-defense when he fired on a suspect, attempts to introduce evidence that the suspect was armed
 
 
 [3]
 Although the evidence that Sherrod was unarmed is not dispositive as to the reasonableness of Berry's action, it is strong and prejudicial evidence against him. However, any prejudicial impact does not make the evidence irrelevant or not impeaching. Instead the issue of whether the prejudicial impact of the evidence outweighs its probative value is a separate and distinct issue from the evidence's relevance and impeachment value and is a separate ground for excluding the evidence. See infra at 811-12
 
 
 [4]
 The entire discussion was as follows:
 MR. BARASHA: Your Honor, with respect to that third one, it's the defendants' belief that the existence or nonexistence of a weapon is not relevant.
 THE COURT: That motion is denied for the simple reason the nonexistence of a weapon in this case was very important in the last trial and it will be very important in this one.
 The fact that these two young men who were in this car never had a weapon, and when the body of Ronald Sherrod was turned over, he didn't have a weapon either in his left pocket or anywhere else. That's very important evidence in this case.
 MR. BARASHA: Your Honor, it's the--nevertheless, Your Honor, it's our position as far as whether Officer Berry was justified in shooting Ronald Sherrod was a decision that he had to make in an instant and whether--
 THE COURT: He made the decision--Mr. Barasha, Mr. Berry made the decision he said because he thought when Ronald Sherrod did this, Ronald Sherrod was going to pick a gun from his pocket. That's what Mr. Berry thought.
 MR. BARASHA: That's correct, Your Honor.
 THE COURT: It is very important to show he was mistaken. No, that will be denied.
 
 
 [1]
 Rule 402. Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible
 All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.
 
 
 [2]
 Similarly, had Sherrod been armed that evidence would have been as relevant as the fact that he was unarmed
 
 
 [3]
 In the original panel opinion, it appears that both the majority and dissent accepted the position that the defendants had preserved some form of objection to this evidence on the ground of prejudice. See Sherrod v. Berry, 827 F.2d 195, 203-04, 216-17 (7th Cir.1987), vacated, 835 F.2d 1222 (7th Cir.1988)
 
 
 [4]
 Had Sherrod been armed, in my view this evidence should also have been excluded as being more prejudicial than probative