51 F.3d 1346
 41 Fed. R. Evid. Serv. 612
 Carrie JAFFEE, as Special Administrator for Ricky Allen, Sr.
and Lechia Allen, Next Friend of Ricky Allen, Jr.,
and Brandon Allen, Plaintiffs-Appellees,
v.
Mary Lu REDMOND, Hoffman Estates Police Officer and Village
of Hoffman Estates, Illinois, Defendants-Appellants.
 No. 94-1151.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 14, 1994.
Decided April 6, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied May 12, 1995.
 
 Kenneth N. Flaxman, Ronald L. Futterman (argued), Futterman & Howard, Jennifer Kay Soule, Hartunian & Associates, Chicago, IL, for Carrie Jaffee and Lechia Allen.
 Gregory E. Rogus (argued), Robert Wilens, Segal, McCambridge, Singer & Mahoney, Chicago, IL, for Mary Lu Redmond and Village of Hoffman Estates, Illinois.
 Before WOOD, GODBOLD* and COFFEY, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 On June 27, 1991, Police Officer Mary Lu Redmond responded to a reported fight in progress at an apartment complex. When she arrived at the scene, she was advised that there had been a stabbing inside the building. Within minutes thereafter, Officer Redmond stated that she fired her weapon and killed Ricky Allen, Sr. as he was pursuing and rapidly gaining on another man, and was poised to stab him with a butcher knife. Allen's surviving family members filed suit against Officer Redmond and her employer, the Village of Hoffman Estates, Illinois (the "Village"), alleging that Officer Redmond's use of deadly force violated Allen's rights under the Fourth and Fourteenth Amendments to the United States Constitution, and that Officer Redmond caused Allen's wrongful death under the Illinois Wrongful Death Act, 740 ILCS 180/0.01-2.2 (1994). Redmond and the Village appeal the $545,000 jury verdict. The appellants raise two issues on appeal: first, that the district court erred in instructing the jury on the use of deadly force; and second, that the district court erred by refusing to recognize a privilege for confidential communications between Officer Redmond and the licensed clinical social worker from whom she sought counseling. We affirm as to the first issue and reverse and remand as to the second issue dealing with the question of privilege.
 
 I. BACKGROUND
 A. The Shooting
 
 2
 On June 27, 1991, Officer Redmond, who was alone on patrol duty in that area on the day shift, responded to a dispatcher's report of a fight in progress at the Grand Canyon Estates apartment complex in the Village of Hoffman Estates, a suburb of Chicago, Illinois. Redmond was the first police officer to arrive at the scene. Officer Redmond testified that, as she pulled into the apartment complex parking lot, she saw two African-American women running toward her car, waving their arms above their heads,[1] one of whom stated that there had been a stabbing inside the building. Redmond relayed this information to her dispatcher and requested assistance and an ambulance.
 
 
 3
 As Redmond approached the apartment building, five men ran out the front door yelling and screaming. One of the men was waving a pipe above his head. At this time, Officer Redmond testified that she ordered the man carrying the pipe to drop the pipe and also ordered everybody to the ground. After repeating the command "Drop the pipe" several times to no avail, Officer Redmond was forced to draw her service revolver. Almost immediately thereafter, two more men--a Caucasian man followed by an African-American man in hot pursuit--came running out of the door of the building. Officer Redmond testified that the African-American man, later identified as Ricky Allen, Sr., was armed with a butcher knife, was chasing and gaining on the Caucasian man, and was "directly behind" and poised to stab him when she fired the fatal shot. Officer Redmond testified that she commanded Allen to drop the butcher knife several times before firing:
 
 
 4
 I ordered the black male subject with the knife to drop the knife several times. I told him to drop the knife and get on the ground.... I was yelling at him to drop the knife and get on the ground.... [H]e did not drop the knife and he did not get on the ground.... [I yelled] at least three times. I just kept yelling the minute I saw him.
 
 
 5
 Officer Redmond explained the moment before the shooting as follows:
 
 
 6
 As [Allen] was gaining speed on the first subject until they were directly--he was directly in front of him, like the first subject's back, and then the second subject, as he was gaining on him the second subject, the male black subject with the knife took the knife back, raised it above his head and I waited, and as he started to come down with the knife and made the downward motion, I fired one shot at him.
 
 
 7
 Redmond testified that she "didn't even have time to square up,"[2] when she fired her weapon "[b]ecause the second subject was about to kill the first subject with the knife." She noted that only three or four seconds elapsed from the time Allen emerged from the apartment building door until the time she fired. Four of Allen's brothers and sisters, all of whom witnessed the shooting, testified that Allen was unarmed when Officer Redmond fired her weapon.
 
 
 8
 Officer Redmond testified that after she fired the single shot at Ricky Allen, Sr., he fell to the ground and she ran toward him with her gun at her side. She observed the butcher knife lying on the grass approximately two or three feet from his body. She repeated her request for backup support and an ambulance on her portable radio, as "people came pouring out of the buildings." Redmond stated that several people within the crowd "started to charge" at her, as they were "yelling," "screaming," "swearing" and "quite hysterical." She raised her gun when one person from the crowd came within arm's length, and ordered everyone "to get back, get down, get beyond the sidewalk, get on the ground." In her testimony, Officer Redmond made it clear that no one from the crowd attempted to come to Allen's aid, and that the knife was not moved from the place it landed when Allen fell to the ground until it was retrieved by one of the investigating officers.
 
 
 9
 Allen's siblings remembered the events just after the shooting differently. Connie Allen, his sister, testified that she attempted to approach her brother's body when Officer Redmond, with her gun raised, ordered her to get back and also stated that Redmond ordered her sister Sharon to step back at gunpoint. Connie Allen did not observe a knife lying on the grass near her brother's body until after the ambulance had taken the body away. When asked at trial why she had not reported what she had seen to any of the police investigating the shooting, Connie stated that she had not felt like talking to anyone immediately after the shooting.
 
 
 10
 Officer Joe Graham arrived at the Grand Canyon Estates apartment complex shortly after the shooting. When he arrived, he saw a large crowd of people--approximately twenty-five to thirty African-Americans and five to ten Caucasians--gathered on the grass, and a number of people "rushing out of the apartment buildings--to see what was going on." Officer Graham observed Officer Redmond standing on the lawn, behind Allen's body, with her gun drawn and aimed at the crowd. Officer Graham testified during his deposition that Officer Redmond appeared "somewhat bewildered" when he first arrived at the scene, and later at trial he explained that he meant she was "visibly shaken or upset or disoriented." Officer Graham testified that the members of the crowd were "fluctuating back and forth ... in a very chaotic movement," yelling that Officer Redmond "had shot Mr. Allen and that she didn't have to shoot him in the head" and that "they were going to sue the white bitch for shooting Mr. Allen." Officer Graham testified that when he knelt down to check for Allen's pulse, he saw a butcher knife lying on the grass approximately an arm's length away from the body.
 
 B. Officer Redmond's Counseling
 
 11
 After the shooting, Officer Redmond sought counseling from Karen Beyer, a licensed clinical social worker[3] certified by the state of Illinois as an employee assistance counselor and employed by the Village. Officer Redmond met with Beyer for the first time three or four days after the shooting incident and continued counseling for approximately two or three sessions per week through at least January of 1992, six months after the shooting.[4]
 
 
 12
 During pre-trial discovery, the plaintiffs learned that Officer Redmond had participated in a number of counseling sessions with Beyer, the licensed clinical social worker. At Officer Redmond's deposition, the plaintiffs inquired regarding the substance of her communications with Beyer. Officer Redmond refused to respond to this line of questioning, contending that her communications with a licensed clinical social worker were privileged. The plaintiffs subsequently subpoenaed Beyer to testify at a deposition and to produce her credentials as a counseling professional as well as all her "notes, records, [and] reports pertaining to Mary Lu Redmond." The defendants, Redmond and the Village, moved to quash the subpoena, maintaining that all of Officer Redmond's communications occurring within the context of the counseling relationship, as well as Karen Beyer's notes and reports pertaining to those communications, were privileged. The trial court denied the defendants' motion to quash, based on the judge's belief that the psychotherapist/patient privilege recognized in other circuits does not extend to a licensed clinical social worker,[5] and ordered Karen Beyer to testify as to "the disclosures made to her by Ms. Redmond of the incidents of the day that relate to [the shooting]." We wish to point out that the Illinois statute specifically grants the psychotherapist/patient privilege to social workers. See 740 ILCS 110/2, 110/10 (1994). The court ordered Officer Redmond to appear for a third deposition session to answer questions concerning her communications with Karen Beyer. Officer Redmond appeared for the third deposition session, and again the answers she gave regarding her counseling sessions with Karen Beyer were evasive and incomplete, obviously an attempt to protect her privileged communications.
 
 
 13
 When Karen Beyer appeared for her deposition, she limited her answers to only those facts concerning disclosures made by Officer Redmond about the circumstances leading up to the shooting incident on June 27, 1991.[6] Beyer also refused to produce any notes or reports from Officer Redmond's counseling sessions. The plaintiffs filed another motion to compel Karen Beyer to answer certain questions to which objections had been made and to produce all of her notes and reports on Mary Lu Redmond. After Karen Beyer's second deposition session, the plaintiffs filed another motion to compel further responses, and the trial judge responded with an order permitting unrestricted and unlimited inquiry into statements made by Officer Redmond to Karen Beyer during their counseling sessions.[7] At her final deposition session, and again during trial, Officer Redmond responded "I don't recall" to the majority of questions dealing with the substance of her counseling sessions with her therapist and licensed clinical social worker, Ms. Beyer.[8] Ms. Beyer likewise refused to divulge her communications other than the officer's factual description of the events leading up to the shooting. Karen Beyer did produce three pages of redacted notes.
 
 
 14
 On April 6, 1993, the district court ordered that Officer Redmond would be barred from testifying at trial as to her version of the shooting incident "because plaintiffs' attorneys have been blocked from effective cross-examination." Just prior to trial, on December 10, 1993, the trial judge reconsidered and vacated this ruling, but made it clear that the jury would be instructed that it could draw an adverse inference from the defendants' failure to produce Karen Beyer's notes and in fact gave such an instruction. At trial, the district judge instructed the jury that the defendants had no legal justification to refuse to produce Karen Beyer's notes of her counseling sessions with Officer Redmond. Over the defendants' objection, the district judge instructed the jury that it was "entitled to presume that the contents of the notes would be unfavorable to Mary Lu Redmond and the Village of Hoffman Estates." (Emphasis added.)[9]
 
 
 15
 The trial judge also instructed the jury on the factors it could take into account in determining whether Officer Redmond's use of deadly force was proper. The court gave the plaintiffs' proffered Jury Instruction No. 5, over the defendants' objection, and rejected the defendants' Proposed Jury Instruction No. 7.[10] The defendants' Proposed Jury Instruction No. 7 included two points omitted from the plaintiffs' Jury Instruction No. 5; first, that the jury should not consider a police officer's subjective intentions or motivations in using deadly force; and second, that the jury should make allowance for the fact that police officers frequently "have to make split second judgments under tense, uncertain, and rapidly evolving circumstances."
 
 
 16
 The jury returned a verdict in favor of the plaintiffs based on these jury instructions and awarded $45,000 for the federal constitutional claim and $500,000 for the state wrongful death claim. The defendants appeal.
 
 II. DISCUSSION
 
 17
 Officer Redmond and the Village urge reversal on two grounds, arguing that: (1) the district court erred in instructing the jury on the use of deadly force; and (2) the district court erred in refusing to recognize a privilege under Rule 501 of the Federal Rules of Evidence for confidential communications between Officer Redmond and Karen Beyer, the trained and experienced licensed clinical social worker from whom Redmond received counseling. Both of these asserted errors stem from the court's instructions to the jury. On appeal, our review of jury instructions is limited. Doe v. Burnham, 6 F.3d 476, 479 (7th Cir.1993). Jury instructions "must be correct statements of the law that are supported by the evidence." United States v. Perez, 43 F.3d 1131, 1137 (7th Cir.1994). We review jury instructions as a whole to determine " 'if the instructions ... were sufficient to inform the jury correctly of the applicable law.' " Patel v. Gayes, 984 F.2d 214, 218-19 (7th Cir.1993) (quoting United States v. Villarreal, 977 F.2d 1077, 1079 (7th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1350, 122 L.Ed.2d 731 (1993)). Reversal is warranted only if a jury instruction misguided the jury to a litigant's prejudice. Trytko v. Hubbell, Inc., 28 F.3d 715, 725 (7th Cir.1994).
 
 
 18
 We thus undertake a two-part inquiry. "First, we determine whether the instruction misstates or insufficiently states the law. If so, we next determine whether the misstatement or deficiency likely confused or misled the jury causing prejudice to a litigant." Burnham, 6 F.3d at 479. We defer to the district court's discretion in formulating the specific wording of the instructions, so long as the instructions as given cover all of the essential points of the applicable law. United States v. Scott, 19 F.3d 1238, 1245 (7th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 163, 130 L.Ed.2d 101 (1994).
 
 
 19
 A. Fourth Amendment Deadly Force Jury Instruction
 
 
 20
 Officer Redmond and the Village assert that the district court erred in giving Jury Instruction No. 5, and in failing to give Defendants' Proposed Jury Instruction No. 7, both of which addressed the objective reasonableness of Officer Redmond's use of deadly force. See supra n. 10. The defendants note that the instruction given failed to explain that a police officer's "subjective intentions or motivations, good or evil, should not be considered in determining whether [the officer] acted in an objectively reasonable manner" or to explain that police officers "may have to make split second judgments under tense, uncertain, and rapidly evolving circumstances." See Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). The defendants contend that these omissions rendered the given instruction insufficient as a matter of law. We disagree.
 
 
 21
 Excessive force claims, including deadly force claims,[11] resulting from any seizure are analyzed under the Fourth Amendment's objective reasonableness standard. Jones v. Webb, 45 F.3d 178, 183 (7th Cir.1995); Ford v. Childers, 855 F.2d 1271, 1275 (7th Cir.1988) (en banc ). The objective reasonableness of a police officer's actions depends upon "the information [the officer] possessed immediately prior to and at the very moment [she] fired the fatal shot." Sherrod v. Berry, 856 F.2d 802, 805 (7th Cir.1988) (en banc ); see also Graham, 490 U.S. at 396, 109 S.Ct. at 1872 ("[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"). Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S.Ct. at 1872. A police officer's subjective intentions are irrelevant; "evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will ... good intentions make an objectively unreasonable use of force constitutional." Id. at 397, 109 S.Ct. at 1872-73. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Id. at 396-97, 109 S.Ct. at 1872; see also Sherrod, 856 F.2d at 805 (determination of propriety of police officer's use of deadly force requires analysis of "the knowledge, facts and circumstances known to the officer at the time [she] exercised [her] split-second judgment as to whether the use of deadly force was warranted").
 
 
 22
 We believe, in part considering our limited review of jury instructions, that the instruction the court gave was adequate. It was objective. The jury was instructed to consider all the facts and circumstances with which Mary Lu Redmond was confronted. This was to be "judged from the perspective of a reasonable police officer who was confronted with the circumstances presented to Mary Lu Redmond at the moment the force was used." It then emphasized whether a "reasonable officer" in her place would have believed "that the force was necessary to prevent the death, etc." We believe that the instruction was adequate and permitted both the parties to argue their theories of the case about times and other circumstances. It could have been amplified, but we need not adopt for an instruction the language various courts use in particular cases.[12]
 
 B. Counseling Privilege
 
 23
 Officer Redmond requests that we vacate the jury's verdict on the ground that the district court's instructions improperly stated to the jurors that they were permitted to draw an adverse inference from the defendants' failure to disclose information protected by the psychotherapist/patient privilege. The trial court's instruction explicitly allowed the jury to infer that Officer Redmond revealed unfavorable and damaging information to her therapist during her many counseling sessions; the judge told the jury that it was "entitled to presume that the contents of the notes would be unfavorable to Mary Lu Redmond and the Village of Hoffman Estates." Initially, we note that the existence and scope of evidentiary privileges are to be "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501.[13] The Supreme Court has observed that Rule 501 "manifested an affirmative intention not to freeze the law of privilege" but that its purpose was to " 'provide the courts with the flexibility to develop rules of privilege on a case-by-case basis.' " Trammel v. United States, 445 U.S. 40, 47, 100 S.Ct. 906, 911, 63 L.Ed.2d 186 (1980) (citations omitted).
 
 
 24
 This is a case of first impression before the Seventh Circuit, questioning the existence of a federal privilege for confidential communications between a licensed clinical social worker and a patient. The Second and Sixth Circuits have determined that "reason and experience" compel the recognition of the psychotherapist/patient privilege in both civil and criminal cases. In re Doe, 964 F.2d 1325 (2d Cir.1992); In re Zuniga, 714 F.2d 632 (6th Cir.), cert. denied, 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983). In contrast, the Fifth, Ninth, Tenth, and Eleventh Circuits have rejected the privilege in factual situations not even remotely similar to the one before this court, each interpreting Rule 501 as limiting the development of privileges to those recognized by the common law. See United States v. Burtrum, 17 F.3d 1299 (10th Cir.1994) (declining to recognize a psychotherapist/patient privilege in criminal child sexual abuse case); In re Grand Jury Proceedings, 867 F.2d 562 (9th Cir.), cert. denied, 493 U.S. 906, 110 S.Ct. 265, 107 L.Ed.2d 214 (1989) (rejecting assertion of a psychotherapist/patient privilege by target of grand jury murder investigation); United States v. Corona, 849 F.2d 562 (11th Cir.1988), cert. denied, 489 U.S. 1084, 109 S.Ct. 1542, 103 L.Ed.2d 846 (1989) (refusing to recognize a psychotherapist/patient privilege in criminal firearms case); United States v. Meagher, 531 F.2d 752 (5th Cir.), cert. denied, 429 U.S. 853, 97 S.Ct. 146, 50 L.Ed.2d 128 (1976) (rejecting criminal defendant's assertion of psychiatrist/patient privilege in bank robbery trial). With the exception of the Tenth Circuit's decision in Burtrum, which involved admissions by a pedophile to his therapist of criminal child sexual assault,[14] the decisions refusing to recognize the psychotherapist/patient privilege are at least five years old. Much has changed with the mental health field in the past five years.[15] The need, and demand, for counseling services has skyrocketed during the past several years due to the rapid spread of violence and crime throughout our nation. Countless innocent bystanders, as well as law enforcement officers themselves, witness violent crimes and homicides.[16] These unfortunate individuals, who include not only law enforcement personnel, but also students, school and hospital employees, postal workers, and members of the general public, need and deserve the help, support, and emotional release provided by confidential counseling. The recognition of a psychotherapist/patient privilege can only serve to encourage troubled individuals, as well as those who witness, participate in, and are intimately affected by acts of violence in today's stressful, crime ridden, homicidal environment, to seek the necessary professional counseling and to assist mental health professionals to succeed in their endeavors.
 
 
 25
 We agree with the Second and Sixth Circuits that reason and experience compel the recognition of a psychotherapist/patient privilege. Reason tells us that psychotherapists and patients share a unique relationship, in which the patient's ability to communicate freely without the fear of public disclosure is the key to successful treatment. See In re Zuniga, 714 F.2d at 640 ("[t]he essential element of the psychotherapist-patient privilege is its assurance to the patient that his innermost thoughts may be revealed [to his therapist] without fear of disclosure " in order that the patient might receive adequate treatment) (emphasis added).
 
 
 26
 "The psychiatric patient ... exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition.... It would be too much to expect them to do so if they knew that all they say--and all that the psychiatrist learns from what they say--may be revealed to the whole world from a witness stand."
 
 
 27
 In re Zuniga, 714 F.2d at 638 (quoting Taylor v. United States, 222 F.2d 398, 401 (D.C.Cir.1955) (quoting Guttmacher and Weihofen, Psychiatry and the Law 272 (1952))). Moreover, communications with a psychotherapist often involve highly personal matters, the disclosure of which "would frequently be embarrassing to the point of mortification for the patient." In re Doe, 964 F.2d at 1328. Indeed, courts and commentators have focused on an individual's right of privacy, "a fundamental tenet of the American legal tradition," to justify the psychotherapist/patient privilege. See, e.g., Developments in the Law: Part IV, 98 Harv.L.Rev. at 1544-47 ("[c]ompelled disclosure of information communicated by a patient to a psychotherapist will therefore often threaten the privacy of the patient's most intimate thoughts"); In re Lifschutz, 2 Cal.3d 415, 431-32, 85 Cal.Rptr. 829, 839, 467 P.2d 557, 567 (1970) (quoting Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965)) ("We believe that a patient's interest in keeping such confidential revelations from public purview, in retaining this substantial privacy, has deeper roots than the [state] statute and draws sustenance from our constitutional heritage.... [T]he United States Supreme Court declared that 'Various guarantees [of the Bill of Rights] create zones of privacy,' and we believe that the confidentiality of the psychotherapeutic session falls within one such zone").
 
 
 28
 Privacy serves several functions: it allows room for personal autonomy, it permits necessary emotional release, and it promotes free self-evaluation. The privacy rationale, however, regards the privacy of individuals as important not only in fostering these ends, but also as an end in itself. Compelled disclosure is considered inherently wrong because it inflicts two distinct kinds of harm: (1) the embarrassment of having secrets revealed to the public, and (2) the forced breach of an entrusted confidence.
 
 
 29
 Developments in the Law--Privileged Communication: Part II. Modes of Analysis, 98 Harv.L.Rev. 1471, 1481 (1985) (citations omitted).
 
 
 30
 We are cognizant of the fact that all fifty states have recognized the need for and have adopted varying forms of the psychotherapist-patient privilege.[17] See Developments in the Law: Part IV, 98 Harv.L.Rev. at 1539 ("the psychotherapist-patient privilege has won consistent approval from courts and commentators"). Although federal common law governs our recognition of privilege in this case, see In re Pebsworth, 705 F.2d 261, 262 (7th Cir.1983), the law of privilege as developed by the states is not irrelevant as the Supreme Court "has taken note of state privilege laws in determining whether to retain them in the federal system." United States v. Gillock, 445 U.S. 360, 369 n. 8, 100 S.Ct. 1185, 1191 n. 8, 63 L.Ed.2d 454 (1980); see also Memorial Hospital v. Shadur, 664 F.2d 1058, 1061 (7th Cir.1981) (quoting United States v. King, 73 F.R.D. 103, 105 (E.D.N.Y.1976)) (" '[a] strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy ' ") (emphasis added); William T. Thompson Co. v. General Nutrition Corp., 671 F.2d 100, 104 (3d Cir.1982) (federal courts are not precluded from "resort[ing] to state law analogies for the development of a federal common law of privileges in instances where the federal rule is unsettled"). The widespread recognition of the psychotherapist/patient privilege in all fifty states is strong evidence that "experience with [the privilege] has been favorable." In re Doe, 964 F.2d at 1328 (emphasis added).
 
 
 31
 Particularly significant to the case before the court is the Illinois Mental Health and Development Disabilities Confidentiality Act, 740 ILCS 110/1-110/17 (1994), which expressly recognizes a psychotherapist/patient privilege:
 
 
 32
 [I]n any civil, criminal, administrative, or legislative proceeding, or in any proceeding preliminary thereto, a recipient, and a therapist on behalf and in the interest of a recipient, has the privilege to refuse to disclose and to prevent the disclosure of the recipient's record or communications.
 
 
 33
 Id. at 110/10 (emphasis added). The term "therapist," as defined by the statute, includes any "psychiatrist, physician, psychologist, social worker, or nurse providing mental health or development disabilities services...." Id. at 110/2 (emphasis added). Illinois law thus explicitly extends the privilege to communications with a licensed clinical social worker, like Karen Beyer.
 
 
 34
 For these reasons, we recognize the existence of a psychotherapist/patient privilege under Rule 501 of the Federal Rules of Evidence.[18] However, we also note that the privilege we recognize in a case of this nature requires an assessment of whether, in the interests of justice, the evidentiary need for the disclosure of the contents of a patient's counseling sessions outweighs that patient's privacy interests. In re Doe, 964 F.2d at 1328; see Trammel, 445 U.S. at 52, 100 S.Ct. at 913 (the question is "whether the privilege ... promotes sufficiently important interests to outweigh the need for probative evidence in the administration of ... justice"); cf. Fed.R.Evid. 403 ("evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence"); Developments in the Law: Part IV, 98 Harv.L.Rev. at 1544-47 ("Because the privilege impedes the judicial truth-seeking function, courts and legislatures have generally limited the privilege to cases in which its application would be consistent with its underlying purposes of facilitating medical diagnosis and treatment"). We acknowledge that "[e]videntiary privileges in litigation are not favored." Herbert v. Lando, 441 U.S. 153, 175, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979). "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed for they are in derogation of the search for the truth." United States v. Nixon, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). Accordingly, we will determine the appropriate scope of the privilege "by balancing the interests protected by shielding the evidence sought with those advanced by disclosure." In re Zuniga, 714 F.2d at 640.
 
 
 35
 We decline to speculate as to what situations would call for the abrogation of this privilege. Instead, we confine our analysis to a factual situation of this nature, where the balance of the competing interests tips sharply in favor of the privilege if we hope to encourage law enforcement officers who are frequently forced to experience traumatic events by the very nature of their work to seek qualified professional help. The plaintiffs sought disclosure of the confidential communications between Officer Redmond and Karen Beyer, a licensed clinical social worker.[19] There were numerous eyewitnesses to the shooting, including Officer Redmond and several of Allen's brothers and sisters, four of whom testified at trial. Officer Redmond testified at trial as to her recollection of the circumstances leading up to the incident. Thus, the plaintiffs' need for Officer Redmond's personal innermost thoughts about the shooting incident were cumulative at best. In contrast, Officer Redmond's privacy interests were, and are still, substantial. Officer Redmond sought professional counseling after an unquestionably traumatic and tragic event she experienced in the line of duty. Her ability, through counseling, to work out the pain and anguish undoubtedly caused by Allen's death in all probability depended to a great deal upon her trust and confidence in her counselor Karen Beyer. Officer Redmond, and all those placed in her most unfortunate circumstances, are entitled to be protected in their desire to seek counseling after mortally wounding another human being in the line of duty. An individual who is troubled as the result of her participation in a violent and tragic event, such as this, displays a most commendable respect for human life and is a person well-suited "to protect and to serve." Based on the facts and circumstances presented in this record, we recognize the existence of the psychotherapist/patient privilege in this Circuit and thus the confidential communications between Mary Lu Redmond and her licensed clinical social worker Karen Beyer are protected from compelled disclosure.
 
 III. CONCLUSION
 
 36
 The judgment of the district court is REVERSED and the case is REMANDED for a new trial consistent with this opinion.
 
 
 
 *
 The Honorable John C. Godbold, of the Eleventh Circuit, is sitting by designation
 
 
 [1]
 The two women waving their arms were Ricky Allen, Sr.'s sisters, Connie Allen and Sharon Allen
 
 
 [2]
 When the officer testified about having had insufficient time to "square up," she was stating that she did not have enough time to assume the proper stance before firing her weapon to ensure the most accurate aim
 
 
 [3]
 Under Illinois law, a licensed clinical social worker provides "mental health services for the evaluation, treatment, and prevention of mental and emotional disorders ... based on knowledge and theory of psychosocial development, behavior, psychopathology, unconscious motivation, interpersonal relationships, and environmental stress." 225 ILCS 20/3 (1994). A licensed clinical social worker is a person "who (1) has a master's or doctoral degree in social work from an accredited graduate school of social work and (2) has at least three years of supervised postmaster's clinical social work practice which shall include the provision of mental health services for the evaluation, treatment, and prevention of mental and emotional disorders." 405 ILCS 5/1-122.1 (1994). An individual cannot obtain a license to practice clinical social work until he or she passes an examination for the practice of clinical social work and has completed either (a) a master's degree in social work and 3,000 hours of satisfactory supervised clinical experience, or (b) a doctoral degree in social work and 2,000 hours of satisfactory supervised clinical experience. 225 ILCS 20/9 (1994). Karen Beyer, the Director of Health and Human Services for the Village, received her master's degree in social work from Loyola University in 1969. At the time of trial, she had had some twelve thousand hours of experience in individual, family, and marital psychotherapy, and had participated in clinical supervision in psychotherapy for doctoral psychology students from several psychology programs
 
 
 [4]
 All of Officer Redmond's conversations with Karen Beyer after June 27, 1991 took place during counseling sessions
 
 
 [5]
 The judge stated at the hearing on the defendants' motion to quash:
 But my sense has consistently been, when dealing with these problems, that the place to go as the best source is to look at what the Supreme Court's proposals had been and what have now been referred to as the "Standards," although they are not the Federal Rules of Evidence. And when I looked at that I found that Standard 504 is one that adopts a privilege for psychotherapists. Again referring to Weinstein at 504 at page 504-17, there is a psychotherapist-patient privilege, and that expressly does not apply to social workers.... So where I come out on this one is that someone who is engaging in a kind of counselling to assist someone, maybe over a traumatic experience--someone in the category of Ms. Beyer, who is identified as a licensed clinical social worker and a certified employee assistance counselor--does not stand entitled to privilege under the federal Standard, and that my perception is that the guide to how we should function in these cases, where we are looking at a federal claim as well as a state claim, is that it is the federal standard that ought to control and not the provisions of an Illinois statute that might extend beyond that.
 
 
 [6]
 Karen Beyer also responded to general questions dealing with her credentials as a licensed clinical social worker and the timing and duration of her meetings with Officer Redmond
 
 
 [7]
 Judge Shadur commented at the hearing on the plaintiffs' motion to compel further discovery as follows:
 [M]y sense of the appropriate sanction, if you want to call it that, is to give the plaintiff access.... And that means that as far as I am concerned the bars are pretty well down to the opportunity to have access to Ms. Beyer in terms of what she recalls of those conversations.... [A]n unfettered type of examination of Karen Beyer ... would be an appropriate course of action.
 
 
 [8]
 We note that noncompliance with a court's order is justified when the order commands the revelation of privileged information, the disclosure of which would result in irreparable injury. See In re Novak, 932 F.2d 1397, 1401 n. 7 (11th Cir.1991)
 
 
 [9]
 Jury Instruction No. 8 provided in full that
 You have heard evidence in this case that Karen Beyer, while an employee of the Village of Hoffman Estates, had numerous conversations with Mary Lu Redmond and made notes of those conversations. You have also heard testimony that Ms. Beyer's notes were the property of the Village of Hoffman Estates.
 During the course of this lawsuit the Court ordered the Village of Hoffman Estates to turn over all of Ms. Beyer's notes to plaintiff's attorneys. The Village was provided with numerous opportunities to obey the Court's order and refused to do so. During the course of this lawsuit Mary Lu Redmond also testified that she would not authorize or direct Ms. Beyer to turn over those notes to plaintiff's attorneys.
 During Ms. Beyer's testimony she referred to herself as a "therapist," although she is not a psychiatrist or psychologist--she is a social worker. This Court has ruled that there is no legal justification in this lawsuit, based as it is on a federal constitutional claim, to refuse to produce Ms. Beyer's notes of her conversations with Mary Lu Redmond, and that such refusal was unjustified.
 Under these circumstances, you are entitled to presume that the contents of the notes would be unfavorable to Mary Lu Redmond and the Village of Hoffman Estates.
 (Emphasis added.)
 
 
 [10]
 Jury Instruction No. 5 provided in full that
 Under the circumstances of this case, you may find that Mary Lu Redmond's use of deadly force caused Ricky Allen, Sr. to be deprived of his life without due process of law if and only if the deadly force was not necessary to prevent death or great bodily harm to another person.
 In determining whether the deadly force used by Mary Lu Redmond was necessary to prevent death or great bodily harm, you must consider all the facts and circumstances with which Mary Lu Redmond was confronted. For that purpose the reasonableness of Mary Lu Redmond's decision to use deadly force is to be judged from the perspective of a reasonable police officer who was confronted with the circumstances presented to Mary Lu Redmond at the moment the force was used. In other words, the question is whether a reasonable officer in Mary Lu Redmond's place would then have believed that Ricky Allen, Sr. was about to cause death or great bodily harm to another person and that deadly force was necessary to prevent such harm.
 What the circumstances are that were presented when Mary Lu Redmond used deadly force has been the subject of conflicting testimony and is for you to decide.
 Defendants' Proposed Jury Instruction No. 7 provided in full that
 A police officer's use of force, whether deadly or not, is excessive and violates the constitution only if it is not objectively reasonable. Use of force is objectively reasonable if a reasonable officer on the scene, confronted with the same circumstances, could have taken actions similar to those taken by the defendant Mary Lu Redmond.
 In determining whether the force used by the defendant is objectively reasonable, you must consider all of the facts and circumstances with which the defendant was confronted, including, but not limited to:
 
 
 [1]
 The information available to the defendant at the time of the incident;
 
 
 [2]
 The acts of the plaintiff(s) or plaintiff's decedent; and
 
 
 [3]
 Whether the plaintiff's decedent reasonably appeared to be a threat to the officer or to other persons
 The defendant's subjective intentions or motivations, good or evil, should not be considered in determining whether she acted in an objectively reasonable manner.
 The reasonableness of the defendant's conduct is to be considered from the perspective of a reasonable officer at the moment the force was used, and not with the 20/20 vision of hindsight. In other words, you must make allowance for the fact that officers may have to make split second judgments under tense, uncertain, and rapidly evolving circumstances.
 
 
 [11]
 We note that a police officer may, without violating the proscription of the Fourth Amendment, use deadly force to stop a suspected felon, if the officer has probable cause to believe that the suspect poses a threat of serious physical injury to the officer or to another person. See Tennessee v. Garner, 471 U.S. 1, 12, 105 S.Ct. 1694, 1701-02, 85 L.Ed.2d 1 (1985); Sherrod v. Berry, 856 F.2d 802, 805 (7th Cir.1988) (en banc ) ("when an officer believes that a suspect's actions places him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force ") (emphasis in original)
 
 
 [12]
 Although we do not believe that a more detailed instruction was necessary, we note that the evidence in this case was consistent with the Defendants' Proposed Jury Instruction No. 7. Each of the witnesses to the shooting testified that no more than four or five seconds elapsed from the time Ricky Allen, Sr., carrying a butcher knife, emerged from the door of the apartment building until the time Officer Redmond fired her weapon. Officer Redmond was forced to make a life or death decision in a matter of seconds as she observed the butcher knife in the hand of the assailant move downward toward the back of his intended victim. Judge Shadur commented that "one of the problems with [defendants' proposed instruction is that] the split second business is ... so inconsistent with [Officer Redmond's] own testimony." The situation Officer Redmond faced did not become life-threatening until the very moment when she observed Ricky Allen, Sr. project the butcher knife he held raised above his head in a downward motion toward the back of his intended victim. For that matter of seconds before Allen reached the man he was pursuing, Officer Redmond had no time to cogitate, wait or reflect on the question of whether or not to use deadly force. But once Ricky Allen, Sr. came within striking distance of the man he was chasing, Officer Redmond was forced to make a split-second decision to discharge her weapon in an attempt to save the life of Allen's intended victim. The fact that Officer Redmond may have observed Ricky Allen, Sr. chasing another man in a time frame of four or five seconds prior to the fatal moment does not change the instantaneous and split-second nature of the decision she was forced to make
 
 
 [13]
 Congress chose not to specifically adopt the psychotherapist/patient privilege proposed for inclusion in the Federal Rules of Evidence, but instead adopted Rule 501, which directs the federal courts to develop privilege rules "in the light of reason and experience" and to be guided by statutes of the respective states providing for the privilege
 
 
 [14]
 Significantly, the district court in Burtrum recognized a qualified psychotherapist/patient privilege, but, in applying the balancing test articulated in In re Doe, 964 F.2d at 1328, the district court concluded that "the public interest in protecting young children from sexual abuse 'far outweighs the [defendant's] personal privacy interest and the need for informed medical assistance.' " Burtrum, 17 F.3d at 1301. The Tenth Circuit, in affirming, held only that the psychotherapist/patient privilege would not apply in the criminal child sexual abuse context. Id. at 1302. Implicit in this holding is the possibility that the Tenth Circuit would recognize the psychotherapist/patient privilege in a different context
 
 
 [15]
 "The psychological counseling privilege has gained recognition since the 1950s, when psychology and psychotherapy attained professional legitimacy." Developments in the Law--Privileged Communication: Part IV. Medical and Counseling Privileges, 98 Harv.L.Rev. 1530, 1530 (1985) (citing Louisell, The Psychologist in Today's Legal World (pt. 2), 41 Minn.L.Rev. 731, 731-35 (1957)) (hereinafter "Developments in the Law: Part IV")
 
 
 [16]
 Although police shootings are not uncommon, we have in recent years seen outbreaks of violence and killings in a wide variety of public settings, including hospitals, schools, post offices, abortion clinics and street corners. A quick glance at newspaper headlines in recent months illustrates the violence and trauma innocent bystanders witness all too often: on January 26, 1995, a gunman opened fire near the University of North Carolina-Chapel Hill campus, killing a student and a bicyclist; on December 30, 1994, a man shot and killed two women at two abortion clinics in Brookline, Massachusetts; and on February 8, 1993, three doctors were wounded in a shooting rampage by an emergency room patient at the County-USC Medical Center in Los Angeles, California. The number of shooting incidents at schools is, distressingly, too high to count
 
 
 [17]
 See Developments in the Law: Part IV, 98 Harv.L.Rev. at 1539 (noting that by 1985, 45 states, not including Alaska, Iowa, Nebraska, South Carolina and West Virginia, had enacted psychotherapist/patient privileges); Alaska Stat. Sec. 08.86.200 (1994); Iowa Code Sec. 622.10 (1993); Neb.Rev.Stat. Sec. 27-504 (1994); S.C.Code Ann. Sec. 44-22-90 (Law.Co-op.1993); W.Va.Code Sec. 27-3-1 (1994). Many of these state statutes specifically extend to communications with licensed clinical social workers. See, e.g., Cal.Evid.Code Sec. 1010 (West 1994); Fla.Stat. ch. 90.503 (1994); Va.Code Ann. Sec. 8.01-400.2 (Michie 1994)
 
 
 [18]
 We note that the psychotherapist/patient privilege protects only confidential communications, i.e., all the information learned by the psychotherapist or counselor during treatment that is necessary for treatment. See Developments in the Law: Part IV, 98 Harv.L.Rev. at 1540
 
 
 [19]
 Professionals with quite a variety of job titles and descriptions provide mental health care to patients. Although we have consistently referred to the privilege we recognize in this case as the psychotherapist/patient privilege, we note that this privilege extends to other mental health care providers as well, including licensed clinical social workers. Drawing a distinction between the counseling provided by costly psychotherapists and the counseling provided by more readily accessible social workers serves no discernible public purpose. Indeed, social workers have been characterized as the " 'poor person's psychiatrist.' " Developments in the Law: Part IV, 98 Harv.L.Rev. at 1550 (quoting Comment, Underprivileged Communications: Extension of the Psychotherapist-Patient Privilege to Patients of Psychiatric Social Workers, 61 Calif.L.Rev. 1050, 1050 (1973))