Walter **DEERING**, as personal representative of the estate of Reinhold Deering, Plaintiff–Appellant,

v.

James M. **REICH**, Paul D. Schnasa, Michael J. Wizner, each in their individual capacities and official capacities as police officers for the County of Shawano, and the County of Shawano, Defendants–Appellees.

No. 98–2560.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1998.

Decided July 1, 1999.

Brian C. Hough (argued), Robinson Law Office, Appleton, WI, for Plaintiff–Appellant.

Nathan A. Fishbach (argued), Charles H. Bohl, John P. Spector, Whyte Hirschboeck Dudek S.C., Milwaukee, WI, for Defendants–Appellees.

Before POSNER, Chief Judge, and RIPPLE and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Sixty-nine-year-old Reinhold Deering was awakened at his home in the middle of the night and, through a series of unfortunate events, was shot to death by a deputy sheriff serving an arrest warrant arising out of Deering's failure to appear in court in connection with a misdemeanor case in Shawano County, Wisconsin. It was an altogether tragic event. The primary issue before us is whether certain alleged errors at the trial of a civil suit (under 42 U.S.C. § 1983) growing out of the incident warrant setting aside the verdict of a jury, which found that Deering's constitutional rights were not violated.

Deering lived alone on a farm in Oconto County, Wisconsin, just over the border from Shawano County. At some point in his life he was committed to a mental

institution, and during the months preceding his death he was acting abnormally. For example, one day while he was in Shawano County he backed his vehicle into a parked motorcycle, tipping it over. Although the owner of the motorcycle was willing to settle the dispute if he was paid a few dollars for the gasoline which leaked out of the cycle, Deering was unwilling to pay. As a result of the incident, Deering was charged with misdemeanor property damage. On January 31, 1995, after Deering failed to attend his initial appearance on the charge, a bench warrant for his arrest was issued. Many hours later, around 11 o'clock in the evening, three Shawano County deputy sheriffs—Michael Wizner, Paul Schnasa, and James Reich—met in their dispatch center and, despite the lateness of the hour, decided to arrest Deering on the warrant. Just before they arrived at Deering's farm, which as we said was in the neighboring county, Deputy Wizner notified the Oconto County sheriff's department that they were coming into Oconto County to serve the warrant. The Oconto County sheriff's department acknowledged this communication by stating "10–4."

Wearing bulletproof vests, the deputies went to the farm in separate squad cars, arriving around 12:45 a.m. on February 1. Approaching the farmhouse, they turned off the lights of their squad cars and parked out of sight. On foot, they sneaked up to the house and looked in. Through the window of a bedroom, which was dimly lit, Reich and Wizner saw Deering sleeping in his bed. Schnasa knocked on the back door. Deputy Reich saw Deering get out of bed, go to the back door, look out, and say "Who's there?" The officers identified themselves. According to them, Deering said something like "Goddamn Sheriff's Department." The next thing Schnasa saw was the barrel of a shotgun or a rifle. It turned out to be Deering's 16–gauge, single-shot shotgun. Deputy Reich also saw the weapon, and both officers yelled "gun."

Deputy Schnasa ran to the squad to radio for assistance; the other two deputies sought cover, with Wizner running to the northwest corner of the house and Reich to a shed. Because it was the middle of the night and fairly dark in the yard, Wizner shined a flashlight on Deering, telling him to "drop the gun." Wizner testified that Deering moved away from the house into the yard. Next, Wizner says, Deering turned and fired a shot in his direction. Wizner, incorrectly it turns out, thought he was hit.

Deputy Reich could not see Deering but, hearing the commotion, he moved forward and drew a bead on Deering. At this time, Deering was in a part of the yard which was now partially illuminated by a yard light. Reich said he believed that Wizner had been hit. Reich shined his flashlight on Deering. He thought that Deering was facing towards him with the shotgun at his shoulder. Reich yelled at Deering to put the gun down. He then fired 11 rounds at Deering, killing him when 2 of the shots hit him in the back.

Walter Deering, the personal representative of Reinhold Deering's estate, filed the present case, pursuant to 42 U.S.C. § 1983, alleging that Reich used unreasonable force against Reinhold Deering; that Deputies Schnasa, Wizner, and Reich deprived Deering of his due process rights by the manner in which they attempted to arrest him; and that Shawano County had policies, customs, and practices which caused the deprivations of Deering's constitutional rights. All of the claims, except the excessive force claim against Reich, were dismissed on the defendants' motion for summary judgment. A trial was held on the claim against Reich, and the jury returned a verdict in his favor.

■ One of the issues raised on this appeal is a nonstarter: Deering claims that Reich "was acting as a private citizen, as opposed to police officer, when he killed Mr. Deering" because he pulled the trigger in Shawano, not Oconto, County. For Fourth Amendment purposes, however,

Reich was acting as a law enforcement officer (i.e., under color of law) when he was at Deering's farm, and it is the reasonableness of his conduct, not compliance with whatever geographical boundaries Wisconsin sets for its counties, that determines violations. We might have a different case if Reich, to settle some personal score, was on a purely private mission to kill Deering. That's obviously not the case here. And besides, we're not all that certain that the deputies even violated the state statute upon which Deering relies (59.28 Wis. Stat., a colorful law that authorizes sheriffs to "quiet and suppress all affrays, routs, riots, unlawful assemblies and insurrections" in their counties) when they informed the sheriff's department in Shawano of their mission and, from the record here, heard no objection to their quest.

We now move to the main cluster of arguments on this appeal, which centers on related jury instructions and evidentiary rulings, involving how to evaluate whether Deputy Reich's firing at Deering was reasonable under the totality of the circumstances. The arguments swirl around a number of questions. The arguments concern whether the deputies had an obligation to use all feasible alternatives to avoid a situation such as the one which developed here and the role what has been called "preseizure" conduct plays in the analysis of Fourth Amendment claims.

Essentially claiming that the jury instructions improperly limited what the jury could consider, rather than permitting consideration of the totality of the circumstances, Deering objects to certain statements in the instructions. One is that "[t]here is no requirement that police officers use all feasible alternatives to avoid a situation where deadly force can justifiably be used." Other objections are found in the following sentences:

[i]n considering the circumstances in this case, you are instructed that the reasons for issuing the warrant for Reinhold Deering's arrest are irrelevant.

You are further instructed that the warrant did not require service at any particular time of the day or night.

Perhaps with an eye on the totality of the circumstances, the trial judge allowed some background testimony from Deputy Wizner about the incident giving rise to the complaint against Deering. There was testimony that Deering's car, while moving out of a parking space, bumped into a motorcycle, tipping it over and causing minor damage. Objections were sustained to questions about the owner of the motorcycle being willing to resolve the matter informally by having Deering pay for the gasoline which was spilled. In addition, objections were sustained to questions put to Deputy Reich about what he knew: about whether the complaint "had something to do with minor damage to a parked motorcycle" and about the fact that the warrant was for a failure to appear. In response to repeated objections, the judge ruled that the nature of the charge underlying the warrant (a misdemeanor) was irrelevant because the basis of the charge and the reasons for issuing the bench warrant were "preseizure" activity and thus not germane to an analysis of whether Reich's firing at Deering was reasonable, although the fact that the deputies had a warrant was, of course, admissible.

It is troubling to us that the instructions and the evidentiary rulings take a rather restrictive view of what constitutes the totality of the circumstances. As the instructions properly note, the reasonableness of Reich's shooting of Deering must be judged by the totality of the circumstances. The question is, "what circumstances"? Or, using the defense phrasing, what is "seizure" conduct and what is "preseizure" conduct? Where, in other words, are the boundaries of the totality of the circumstances?

The totality of the circumstances cannot be limited to the precise moment when Deering discharged his weapon. That Deering fired a shot is a very impor-

tant factor; perhaps the jury could easily conclude that it was the controlling factor, but it is not the only relevant factor, in evaluating the constitutionality of Reich's response, which as we have noted was to discharge 11 rounds of ammunition in Deering's direction. If Deering's firing a shot were the only factor, we would hardly need a trial. And, in fact, the trial judge did not take this extreme view; testimony was not limited to the shooting alone. Some evidence was admitted about matters that occurred prior to the shooting as part of the "totality of the circumstances," a phrase which, in itself, ordinarily gives law enforcement officers a good deal of discretion. In fact, the phrase is most often used to provide justification for police action; usually the totality of the circumstances encompasses some fact or another which validates a search, a seizure, or such things as the reasonableness of force used to carry out an arrest. It includes information which the officer had at the time of his actions, but not information uncovered later. See Sherrod v. Berry, 856 F.2d 802 (7th Cir.1988) (en banc).

So, in the present case, does the totality of the circumstances include, for instance, the fact that the deputies decided to serve the warrant in the middle of the night on an elderly man living alone in a rural farmhouse? Deputy Reich calls such information immaterial "preseizure" conduct. He points out that in Carter v. Buscher, 973 F.2d 1328, 1332 (7th Cir.1992), we said that "preseizure conduct is not subject to Fourth Amendment scrutiny."

In Carter, relying on Brower v. County of Inyo, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), we indicated that the proper inquiry is whether the force used was reasonable in the totality of the circumstances, not "whether it was reasonable for the police to create the circumstances." At 1331. Reading Carter in the context of other cases, however, we think the most that can be said, for purposes of our case, is that Carter reinforces the concept, which we will discuss later, that the

deputies did not need to consider all feasible alternatives in serving the warrant on Deering. But that is not the same as saying that any specific alternative is per se reasonable.

■■■ Excessive force claims, including deadly force claims, resulting from a seizure are analyzed under the Fourth Amendment's objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Reasonableness depends on the information the officer possesses prior to and at the immediate time of the shooting; the "knowledge, facts and circumstances known to the officer at the time he exercised his split-second judgment as to whether the use of deadly force was warranted." Sherrod. Reasonableness is evaluated from the officer's perspective at the time, not with $^{20}/_{20}$ hindsight. Graham. What Deputy Reich knew about Deering and the basis for the warrant would seem to fall within these parameters. After all, we can only assume police do not approach the arrest of a jaywalker and a cop killer in the same fashion.

In Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Court considered the constitutionality of a Tennessee statute which authorized the use of deadly force against an unarmed, nondangerous fleeing suspect. In finding the statute unconstitutional, the Court specifically rejected the idea that the Fourth Amendment has nothing to say about how a seizure is made. Rather, in language which is cited over and over, the Court said that in order to determine the constitutionality of a seizure, one must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." At 8, 105 S.Ct. 1694, quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). In the balancing, "it is plain that reasonableness depends on not only when a seizure is

made, but also how it is carried out." 471 U.S. at 8, 105 S.Ct. 1694.

Decided a few years later, *Brower* involved a roadblock consisting of an 18–wheeler set up across a 2–lane road out of sight around a curve with the headlights of a police car trained on the approach so as to blind an oncoming driver. Brower, a fleeing suspect, slammed into the roadblock. The primary issue in the case was whether the driver's death constituted a seizure, and the unanimous conclusion was that it did. But the issue remained as to whether the seizure was reasonable. On remand, the Court of Appeals for the Ninth Circuit assumed the high-speed chase which preceded the crash into the roadblock arguably constituted as a matter of law a substantial threat to the officers which would justify the use of deadly force. Nevertheless, the court said,

> [T]here remains the question whether such force was necessary to prevent the escape. Necessity is the second prerequisite for the use of deadly force under *Garner*. The necessity inquiry is a factual one: Did a reasonable non-deadly alternative exist for apprehending the suspect?

*Brower v. County of Inyo*, 884 F.2d 1316, 1318 (9th Cir.1989). Applied to our case, both the time and manner of the execution of the warrant are part of the totality of the circumstances.

Another question in our case is whether the nature of the underlying crime—the basis for the warrant—is relevant. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the case from which many of the jury instructions in the present case were taken, answers the question. It clearly says that a determination of reasonableness requires a careful balancing of the nature of the intrusion against the governmental interests at stake. The proper application of the reasonableness standard requires consideration of a number of factors known to the officers at the time, including the nature of the underlying crime. It requires careful attention to the facts and circumstances of each particular case, *including the severity of the crime at issue*, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

At 396, 109 S.Ct. 1865 (emphasis added).

*Estate of Starks v. Enyart*, 5 F.3d 230 (1993), involved both the issue of the underlying crime and the relevance of the police conduct. Considering both issues in the context of an officer's claim of qualified immunity from suit, we said that an officer may use deadly force "only to seize a fleeing felon who has committed a violent crime or who presents an immediate danger to the officer or others." Recognizing that officers may use deadly force to protect themselves "even after choosing a risky course of action," we nevertheless found it relevant to the analysis that the officers knew "that the underlying crime was not accomplished violently." At 233. Again we pointed out that it is necessary to balance the intrusion with the countervailing governmental interests at stake. In the context of fleeing felons, what that meant to us was the not very revolutionary idea that deadly force is allowed against violent fleeing felons in part because they have forfeited the right to a less intrusive seizure and that fleeing felons who have not resorted to violence have a right to less intrusive seizures. But we continued:

> If a fleeing felon is converted to a "threatening" fleeing felon solely based on the actions of a police officer, the police should not increase the degree of intrusiveness. In other words, we have no countervailing governmental interest in unreasonable police conduct that would justify a greater intrusion on the individual's rights.

At 234.

A further sampling of our cases illustrates our usual view of totality of the circumstances. In *Jaffee v. Redmond*, 51

F.3d 1346 (7th Cir.1995), Officer Mary Lu Redmond responded to a report of a fight at an apartment complex. When she arrived at the scene, Ricky Allen was chasing and poised to stab another man with a butcher knife. Because a person's life was in danger, Redmond fired, killing Allen. A jury awarded Allen's surviving family members $545,000. Although we remanded the case for a new trial on other grounds,[1] we approved an instruction which said that the jury should consider "all the facts and circumstances with which Mary Lu Redmond was confronted." In *Plakas v. Drinski*, a deputy sheriff was confronted with a man menacing him with a fireplace poker and threatening him with death. The deputy shot and killed the man. In evaluating the district court's grant of summary judgment, relying on *Tom v. Voida*, 963 F.2d 952 (7th Cir.1992), we said that in determining reasonableness, we "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." 19 F.3d at 1150.

■ These cases—and others too numerous to relate—mean that what Deputy Reich knew at the time—about Deering, his crime, and the warrant, and his perception of the danger he and the other deputies were in—was relevant to the evaluation of the reasonableness of his conduct. In addition, the balancing required by *Garner* requires a look at the countervailing governmental interest in serving the warrant on Deering, which would include the time and manner in which it was served. Finally, of course, all of the events that occurred around the time of the shooting are relevant. In other words, the totality of the circumstances is what must be evaluated. When a case is tried to a jury, the evaluation of those circumstances must be left to that jury.

■ In our case, the trial judge came very close to improperly restricting what the jury could consider. Objections were sustained to some questions regarding the events giving rise to the warrant. Despite that, however, the jurors heard evidence about the incident with the motorcycle, which would allow them to understand that the deputies were not looking for a serial murderer when they went to the farmhouse. The jury also heard testimony regarding how the deputies approached the house, how dark it was, what Deering's response was. They were allowed to hear sufficient information about the situation. Because the jury knew in general about the totality of the circumstances, the fact that they did not hear that the warrant was based on a misdemeanor is not reversible error—though we fail to see why this fact was kept from the jury. The jury, we conclude, had a sufficient basis on which to evaluate Reich's response to Deering's firing the shot. Indeed, it is hard to imagine that any prior circumstances would cause the jury to fail to focus on the fact that Deering fired at the deputies. The evidentiary rulings, though a bit restrictive and for that reason troubling, do not, in our view, require a retrial of this hard-fought case.

■ We now turn to the jury instructions. As to the instruction regarding use of alternative methods of achieving law enforcement goals, it was not improper to tell the jury that the deputies did not need to use "all feasible alternatives" to avoid the situation which developed. Such a requirement would be an impossible straightjacket on law enforcement. We have stated:

> There is no precedent in this Circuit (or any other) which says that the Constitution requires law enforcement offi-

1. Certiorari was granted in the case on the other ground, which was whether a privilege protects confidential communications between psychotherapists and their patients. Our decision that it does was affirmed. *Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). When the case was retried, Jaffee again prevailed on her civil rights claim to the tune of $100,000. See our decision on attorney fees at 142 F.3d 409 (7th Cir.1998).

cers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used.

*Plakas v. Drinski,* 19 F.3d 1143, 1148 (7th Cir.1994).

■ Two other brief sentences in the instructions are called into question. One said "the warrant did not require service at any particular time of day or night." This statement is true. Although this instruction can be understood to say that the jury could not consider the folly of serving this warrant in the middle of the night, that reading is not required. The fact that a warrant can be served anytime does not mean that it is appropriate to choose any particular time.

■ The other instruction is very brief—"[i]n considering the circumstances in this case, you are instructed that the reasons for issuing the warrant for Reinhold Deering's arrest are irrelevant." In this case, we think that instruction was wrong. The reasons for issuing the warrant are part of the facts and circumstances known to Deputy Reich. And the fact that an instruction is brief does not mean that, in some circumstances, it cannot be lethal to a verdict.

■ But we must look to the instructions as a whole. *Smith v. Chesapeake & Ohio Ry.,* 778 F.2d 384 (7th Cir. 1985). When we do that we see that the jury was adequately informed that it was to consider the totality of the circumstances. The jury was told:

> Every person has the right not to be subjected to unreasonable or excessive force in the course of the duties performed by a law. enforcement officer, even if the actions of the law enforcement officer are otherwise made in accordance with due process of law. On the other hand, in performing his lawful duties, an officer has the right to use such force as is reasonably necessary under the circumstances. Whether or not the force used was unreasonable is an issue to be determined in the light of

all the surrounding circumstances on the basis of that degree of force a reasonable and prudent officer would have applied under the circumstances disclosed in this case.

. . . . .

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. With respect to a claim of excessive force, the standard that applies is reasonableness under [the] totality of the circumstances existing at that moment. Under the circumstances refers only to those circumstances known and information available to the officer at the time of his action. The calculus of reasonableness must embody allowance for the fact that a police officer is often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

These instructions tell the jury that they must consider all the circumstances and the information available to the officer at the time. The instructions viewed as a whole allow a consideration of what Reich knew about Deering as well as what the situation was at the moment he fired. Although the specific sentence we have quoted was, under the facts of this case, a misstatement, taken in context of the instructions as a whole we find that it does not require a retrial of this case. A trial is not required to be perfect—in fact, most often it cannot be. *See United States v. Green,* 786 F.2d 247 (7th Cir.1986). This was not a perfect trial but, all things considered, we are not moved to conclude that it was blatantly unfair to either side.

■ Deering also raises objections to the testimony of Dr. Virginia Jordan Greenbaum, a forensic pathologist. Dr. Greenbaum did not perform the autopsy, but because of the illness of the person who did, she was allowed to testify for

Deputy Reich pursuant to a stipulation. The stipulation said that her testimony would be limited to explaining the autopsy report, and Reich's counsel stated that she would not "testify that wound number three which is the upper wound was consistent with James Reich's firing of his firearm." But that is precisely what she testified to on redirect. Her testimony could not have more clearly violated the stipulation. However, Reich correctly points out that Deering opened the door to the testimony on cross-examination when Greenbaum was asked about the possible position of Deering when he was shot. Deering's counsel elicited testimony that by looking at a wound track, one can determine the relative positions of the parties, but that, for instance, the relative positions are the same whether a shooter shoots someone standing facing him or whether the person is standing above a person who is lying on his back. The bullet travels perpendicular, front to back. Counsel then asked whether Deering could have been lying on his face on the ground when he was shot. Given that opening, counsel for Reich drove a tank through it on redirect, ultimately obtaining testimony that Deering's wound was consistent with his aiming a shotgun at the time he was killed. The questioning was invited, and we find no error on this point.

■■■■ Mr. Deering also objects to Dr. Greenbaum's testimony as lacking foundation and as inadmissible under *Daubert*. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). We have recently been reminded again that our review of a decision to allow expert testimony is deferential. We review the trial court's decision about reliability of expert testimony for an abuse of discretion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Dr. Greenbaum has been involved in autopsies on at least 75 bodies that have been subjected to bul-

let wounds. The admission of her testimony that the wound was consistent with a certain position was not an abuse of discretion. The judgment of the district court is AFFIRMED.

RIPPLE, Circuit Judge, dissenting.

My colleagues correctly point out that, in order to make an informed decision regarding the objective reasonableness of the defendant's actions, the jury had the duty to assess all of the facts and circumstances surrounding the tragic confrontation. Because the jurors had this duty, they also had a right to know the relevant facts and circumstances that set the stage for the confrontation between the officers and Mr. Deering. The jury therefore was allowed to hear evidence regarding the timing and manner of the officers' approach to Mr. Deering's home, the reason for their visit and the geographical setting of Mr. Deering's home. As my colleagues also point out, it was relevant that the officers chose to show up at Mr. Deering's residence in the middle of the night; it was relevant that Mr. Deering was an elderly man living alone; it was relevant that he lived in an isolated farm house.

Given the permissible—and necessary—scope of the jury's inquiry, there is no principled reason for excluding evidence regarding the nature of the arrest warrant. By withholding this information from the jury and, indeed, affirmatively instructing the jury that such information was not relevant, the district court kept from the jury evidence that would have added to the jury's overall understanding of what the officers knew and how the officers conducted themselves that night. Evidence that the arrest warrant was for failure to appear in court on a misdemeanor charge was directly relevant in the jury's estimation of the reasonableness of the defendant's actions at the moment of the shooting. It spoke directly to the issue of how a reasonable officer would have assessed and then handled Mr. Deering's reaction to being awakened in the dead of night.

The ruling of the district court to exclude evidence of the nature of the arrest warrant unduly limited the jury's view of the totality of the circumstances surrounding the events that led to the shooting of Mr. Deering. In my view, this restriction on the information available to the jury, when combined with the district court's specific instruction that the jury was not to consider the reasons for issuing the warrant and that the warrant could be executed at any time, deprived the plaintiff of a fair trial and requires reversal.